JOSEPH H. KNAPP ET AL. *v.* MARY M. KNAPP ET AL., EXECUTORS.

*Accounting by Executors—Allowance of Counsel Fees—Defending of Suit—Marriage Ceremony—Qualification of Minister.*

Executors who, in the course of their administration after probate of a will, were required to answer and defend a suit seeking discovery of assets by one of them, and an injunction against allowing any assets to pass into the hands of such one, and asking a receivership in the equity court and an accounting there of money and property belonging to deceased, were entitled to an allowance for counsel fees.          pp. 264, 265

A discrepancy in an account filed by executors, involving the omission of some rents collected, *held* not ground for reversing an order dismissing exceptions to the account, the discrepancy being small, and apparently a consequence of loose bookkeeping, and it being to be expected that the orphans' court would have all discrepancies made up before the conclusion of the accounting.          p. 265

A marriage solemnized with a religious ceremony by one who to all appearances is authorized to solemnize marriages, and whom the parties believe, and have every reason to believe, authorized, is not invalid because of some flaw in the title of the supposed minister, or complete absence of authority in fact.

*Decided December 9th, 1925.*

Appeal from the Orphans' Court of Baltimore City.

Exceptions by Joseph H. Knapp and Flora Miller to the account of Mary Knapp and Daniel W. Schilling, executors of the last will and testament of John Knapp, deceased. From an order overruling the exceptions, the exceptants appeal. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Walter C. Mylander,* with whom were *Charles M. Armstrong* and *Joseph S. Knapp, Jr.,* on the brief, for the appellants.

*Bernard J. Flynn,* with whom were *Duncan, Schwatka & Flynn* on the brief, for the appellees.

BOND, C. J., delivered the opinion of the Court.

A supposed will of John Knapp, deceased, which had been probated, and under which the appellees had been appointed, and had qualified, as executors, was afterwards set aside upon a caveat filed by the appellants. The executors thereupon filed an account of their administration pending the controversy over the will, and the appellants filed exceptions to that account. The exceptions were dismissed by the orphans' court, and this appeal is prosecuted from the order of dismissal.

Three objections have been pressed. First, objection is made to an allowance to the executors of $300 to pay for services of counsel in defending a suit filed in the Circuit Court No. 2 of Baltimore City against them, and against Mary M. Knapp individually and The Hopkins Place Savings Bank of Baltimore, in which the complainants (the appellants in this proceeding), sought discovery of assets by Mary M. Knapp, an injunction against permitting assets claimed for the estate to pass into Mary M. Knapp's hands, and for a receivership in the equity court and an accounting

there of money and property which belonged to the deceased. The appellants, in resisting the charge to the estate for the executors' counsel in that suit, argue that it lacks the justification which is found in any case for allowing payment from a common fund for services of counsel to one only of the persons interested but on behalf of all interested, because, here, the defense was antagonistic to the complainants, and not in representation of them. *Title Guarantee and Trust Co. v. Burdette,* 104 Md. 666, 671. But the orphans' court was not dealing with such a case, and no such justification was needed. The executors here, in the course of their administration after the probate of the will, and in their representative capacity, were required to answer and defend the equity suit, and they are entitled to have their expenses in doing it met by the estate, on the same principle as that upon which executors are entitled to an allowance of counsel fees for resisting a caveat after probate of the will. *Decker v. Fahrenholtz,* 107 Md. 515, 524. We think the allowance was valid.

A second objection is one made to the statement of the amount collected in rents of houses which had been owned by the deceased. From evidence received at the hearing on the exceptions, it appeared that some rents collected were omitted from the account. Omissions aggregating $71 are pointed out in argument. The executors' kept their accounts only on loose memoranda, and there is testimony that rents omitted from the account were nevertheless deposited in bank. The orphans court, in an opinion filed in the case, found that the executors had properly charged themselves with rentals collected up to the month of December, 1924, and ordered that they file an amended account to include rentals collected later. How the amounts collected before December, 1924, are now properly charged, is not clear from the record. But we think it sufficient for us to say that we do not find in this objection to the statement of rents ground for reversing the order of the orphans' court and remanding the case. The discrepancy so far pointed out is small, and

apparently a consequence of loose bookkeeping, and the orphans' court will, doubtless, have all discrepancies made up before the accounting is concluded.

The remaining, or third, objection to the account, is the important one in the case. An allowance of seventy-five dollars to Mary M. Knapp as widow of the deceased, under article 93, section 318, of the Code of Public General Laws, is contested on the ground that she was not validly married to the deceased. Testimony taken on this objection showed that a license in due form was procured, and that the marriage was celebrated by a certain Leland W. Windsor, who signed the return certificate as pastor of the Cummins Memorial Reformed Episcopal Church. The marriage was celebrated at Windsor's home. It appears that Windsor, who was during the week a carpenter and builder, had received authority to act as a minister of the Gospel, and to celebrate marriages, from certain elders of an organization called an Apostolic Church, of Philadelphia. The organization was a comparatively informal association of men who contemplated preaching in missions, rather than in churches; and it had disbanded upon the death of its leader five years before the celebration of the marriage now being considered. The elders of the organization issued certificates of ordination, as they were called, and Windsor held one of these. It declared him authorized to celebrate marriages. Because of lack of regular ministers, he was invited to preach in two churches in Baltimore: first in a church of the United Brethren, and then in the Cummins Memorial Reformed Episcopal Church. The officials of this latter church invited him to preach in their pulpit, and he did so for over a year and a half. He was called the pastor of the church, and the congregation understood that he was a minister. The defendant Mary M. Knapp was a member of the congregation. Windsor testifies that he believed himself authorized to perform the marriage ceremony, and that he did actually marry five couples during the time he occupied this pulpit, the defendant Mary M. Knapp and John Knapp having been the

last of the five. The parties to this last marriage, at least, assumed that Windsor was qualified to perform the ceremony, believed themselves duly married, lived together as husband and wife, and were recognized as such. On so much of the facts there is no substantial dispute. But the bishop of the Reformed Episcopal Church testifies that Windsor was not accepted by him or by the church officials as the regular pastor of the Cummins Memorial Church, and that his connection with the church did not, in fact, authorize him to celebrate marriages or perform any other ceremony. And it was denied that his connection with the Apostolic Church and his certificate from elders of that church constituted him an ordained minister such as would be authorized to celebrate marriages under the laws of Maryland.

Much testimony was taken in an effort to fix exactly the status of Windsor; and counsel have argued fully the meaning and effect of the requirement of a religious ceremony as an essential to the validity of a marriage in this state (Denison v. Denison, 35 Md. 361), and the qualifications of Windsor within the meaning of the rule. The orphans' court found from the evidence that Windsor did have the qualifications required. In the opinion of this Court, however, the case should be disposed of, rather, on the ground that, upon the undisputed facts here recounted, the marriage is not open to question. The requirement of a religious ceremony in Maryland is fixed, and this Court has not the slightest disposition to relax it. But can it be the rule that a marriage solemnized with a religious ceremony by one who to all appearances is authorized to solemnize marriages, and whom the parties believe, and have every reason to believe, authorized, may still be invalid because of some flaw in the title of the supposed minister, or complete absence of authority in fact? If so, then the validity of marriages in the state must remain open to question despite all the parties may do to assure validity; for few can look up the orders of apparent ministers, and fewer still can pass judgment on them. Only an unescapable mandate would justify construing the law to

intend such a thing. The law has long recognized that because of this inability of the public to go behind apparent authority, dealings of supposed officers, who are in fact not qualified, must be given effect nevertheless. "Third persons who have occasion to deal with a public officer and to rely upon his acts, finding a person in the apparent possession of the office and ostensibly exercising its functions lawfully and with the acquiescence of the public, can neither be expected to know, nor to investigate, in every instance, his title to the office or his eligibility to election to it. As to them, he must be held to be what he appears to be, the lawful occupant of the office. This rule is demanded by public policy as the only one affording protection to the public." *Mechem, Offices and Officers,* sec. 328. See authorities collected in a note to *Ann. Cases,* 1913 C, 1042; *Smith v. Erb,* 4 Gill, 437, 461; *Koontz v. Burgess & Commrs. of Hancock,* 64 Md. 134; *Izer v. State,* 77 Md. 110; *France, Principles of Corp. Law* (2nd ed.), sec. 61. And the reason for that rule applies with even more force to a case of marriage before an unauthorized minister.

The identical question has never before been raised in Maryland, and there is little authority in the decisions of other American courts, principally because in other states there either is no requirement of a religious ceremony, or, if there is one, the ceremony is not made essential to the validity of the marriage. But in England, where similar statutory requirements have been in force, there is ample authority.

The requirements of a religious ceremony in this state is not contained in an explicit statutory provision. It has been found in the inherited requirements of the English common law, in the custom of the people of Maryland from the time of its colonization and their understanding that some ceremony was essential to validity, and in the expressions of the existing statutes of the state, which show an expectation that all marriages will be celebrated by a religious ceremony. *Denison v. Denison,* 35 Md. 361, 377, 379. But no require-

ment of ceremony in the English law of the 17th and 18th centuries has been construed in England to invalidate a marriage which, for all that appears to the parties, and to the best of their ability, has been celebrated in full conformity with the requirement. See *Reeves, Domestic Relations,* 197. Sir William Scott (Lord Stowell), in *Hawke v. Corri,* 2 Hagg. Cons. 280, said: "It seems to be a generally accredited opinion that if a marriage is had by the ministration of a person in the church who is ostensibly in holy orders, and is not known or suspected by the parties to be otherwise, such marriage should be supported. Parties who come to be married are not expected to ask for the sight of the minister's letters of orders and if they saw them could not be expected to inquire into their authenticity." In *Reg. v. Millis,* 10 Cl. & Fin. 534, on a question of the validity of a marriage celebrated in Ireland before a Presbyterian minister instead of before a priest or deacon episcopally ordained, an analogy was suggested in a marriage by an unordained minister believed by the parties to be ordained; and although the judges were divided on the main question, each one who dealt with the suggested analogy agreed that the marriage by the unordained minister would be valid. Lord Campbell, page 784, said: "What if the person who officiates as a priest, and is believed by the parties to be so, is no priest, and has never received orders of any kind. This question was suggested during the argument, but is not met by the judges. Mr. Pemberton admitted at the bar, as, according to the authorities he was bound to do, that the marriage would be valid. Lord Stowell repeatedly expressed an opinion to this effect; and it turns out that in the instance of the *pseudo* parson, who about twenty years ago officiated as curate of St. Martin's-in-the-Fields, and during that time married many couples, upon the discovery of his being an imposter, which became a matter of great notoriety, no act of Parliament passed to give validity to the marriages which he had solemnized, which could only have arisen from the government of the day being convinced, after the best advice, that in them-

selves they were valid. Indeed, that parties who have vowed eternal fidelity at the altar, and, having gone through all the forms which the church and state prescribe, have received the nuptial benediction from one whom they have every reason to believe was commissioned to pronounce it by a successor of the holy apostles, should run the risk of finding that some years after, from the rector of the parish being imposed upon by a layman pretending to be a priest duly ordained, they are living in a state of concubinage, and that their children are bastards—is a supposition so monstrous that no one has ventured to lay down for law a doctrine which would lead to such consequences." The Lord Chancellor, page 860, said: "It is said that a marriage may be valid though not performed by a person in holy orders, as in the case stated by Lord Stowell, in *Hawk v. Corri* (*supra*) \* \* \* 'I do not very well understand the inference intended to be drawn from this case. It amounts to nothing more than this, that where the law requires the ministration of a person in holy orders, if a man assumes that character under such circumstances as to impose upon those who require his ministration, and they, acting fairly and *bona fide,* are deceived in this particular, the court which has to decide on the validity of the transaction, will not suffer them to be the victims of imposition and fraud, but will decree in favor of the marriage. This exception can only apply in cases where, by the general rule of law, the service of a person in holy orders is necessary; and cannot, therefore, be properly used to impeach that rule." And Lord Cottenham, page 906, said: "It was urged that the marriages were good where the person officiating was not in orders, though pretending and believed to be so. This, I apprehend, depends upon a very different principle. The court in such a case would not, I conceive, permit the title to orders to be inquired into."

These arguments seem to us to be compelling. And we hold that under the law of Maryland the marriage now questioned was valid, and the allowance made to Mary M. Knapp, as widow, proper.

And finding no error to require a reversal of the rulings on the exceptions, the order of the orphans' court will be affirmed.

*Order affirmed.*