# MARGARET LOWE v. EDWARD K.. LOWE.

*Land Acquired by United States—Cession of Jurisdiction by State—Status of Resident—As Party to Divorce Suit.*

That a state, in ceding jurisdiction over land within its limits acquired by the United States, reserves the right that state officers shall serve process thereon, does not affect the exclusive jurisdiction of the United States, the officers being in effect recognized, in the performance of such duties, as officers of the federal government. pp. 595, 596

Acceptance by the United States of the cession of jurisdiction by a state over land within the limits of the latter is evidenced by the purchase of the property by the United States, and in any case such acceptance is to be presumed. pp. 596, 597

In view of Code, art. 16, secs. 37, 40, making residence in the state a prerequisite to filing a bill for divorce therein, the question of the right of a resident on a United States reservation to sue for a divorce in the state courts depends on whether the reservation is, at the time of the filing of the bill for divorce, Maryland territory. p. 597

The United States may acquire land within a state, first, by purchase with the state's consent, as provided by U. S. Const., art. 1, sec. 8, cl. 17, in which case the federal government acquires exclusive dominion and jurisdiction for all purposes, except for the right reserved that state officers may serve process from the state courts thereon; second, by purchase without obtaining the state's consent or by condemnation, in which case the state has full jurisdiction for all purposes except that it cannot so exercise it as to interfere with the essential operations of the federal government there; and, third, by a cession, in the nature of a gift, by the state to the United States of land previously belonging to the state, subject to such conditions or reservations as may be named in the cession. p. 599

Lands acquired by the United States in accordance with the provisions of U. S. Const., art. 1, sec. 8, cl. 17, cease to be a part of the state, and become federal territory, over which the

federal government has complete and exclusive jurisdiction and power of legislation, and consequently persons residing thereon are not residents of the state, within Code, art. 16, secs. 37, 40, so as to be entitled thereunder to file a bill for divorce.

pp. 600, 601

*Decided May 4th, 1926.*

Appeal from the Circuit Court for Cecil County, In Equity (WICKES, J.).

Bill by Edward Lowe against Margaret Lowe. From a decree denying relief upon a cross-bill filed by the original defendant, she appeals. Affirmed.

The cause was submitted on briefs to BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Joshua Clayton,* for the appellant.

*James F. Evans,* for the appellee.

DIGGES, J., delivered the opinion of the Court.

The appellant, complainant in the cross-bill, filed in the Circuit Court for Cecil County, was refused a divorce because the jurisdictional residence relied on was residence on property at Perry Point, which property at the time of bringing the suit belonged to the United States, and residence there was not, in the opinion of the trial judge, sufficient to give the court jurisdiction, because it was not within the county. She appeals from the decree which resulted from that decision.

Section 37 of article 16, Code of 1924, provides:

> "Courts of equity of this state shall have jurisdiction of all applications for divorce; and any person desiring a divorce shall file his or her bill in the court either where the party plaintiff or defendant resides; or if the party against whom the bill is filed be a nonresident, then such bill may be filed in the court where the plaintiff resides."

And section 40 of the same article provides:

"No person shall be entitled to make application for a divorce, where the causes for divorce occurred out of this state, unless the party plaintiff or defendant shall have resided within this state for two years next preceding such application."

The lower court decided that the parties to the divorce proceeding were not residents of Maryland, and therefore, under the provisions of the statute applicable to divorce, the courts of Maryland have no jurisdiction. If the chancellor's decision on this point was correct, it is decisive and conclusive of the case.

Perry Point, with about five hundred acres of land, then in Cecil County, Maryland, was purchased by the United States in 1918, during the war, and devoted to the manufacture of chemicals for war purposes. A manufacturing plant was erected on it, and also a large settlement of workmen's houses. It now has on it, in addition, hospitals for the care of disabled soldiers under the control of the United States Veterans' Bureau. Chapter 743, Acts of the General Assembly of Maryland, 1906, now codified as sections 31, 32 and 33, article 96, provides as follows:

"The consent of the State of Maryland is hereby given in accordance with the seventeenth clause, eighth section of the first article of the Constitution of the United States, to the acquisition by the United States by purchase, condemnation or otherwise of any land in this state required for sites for custom houses, court houses, post offices, arsenals or other public buildings whatever, or for any other purposes of the government.

"Exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States for all purposes except the service upon said sites of all civil and criminal process of the courts of this state, but the jurisdiction so ceded shall continue no longer than the said United States shall own such lands.

"The jurisdiction ceded shall not vest until the
United States shall have acquired the title to said lands
by purchase, condemnation or otherwise; and so long
as the said lands shall remain the property of the
United States when acquired as aforesaid, and no
longer, the same shall be and continue exempt and
exonerated from all state, county and municipal taxa-
tion, assessment, or other charges which may be levied
or imposed under the authority of this State."

The Constitution of the United States, article 1, section 8,
clause 17, provides that the Congress shall have power:

"To exercise exclusive legislation in all cases what-
soever, over such district (not exceeding ten miles
square) as may, by cession of particular states, and the
acceptance of Congress, become the seat of the govern-
ment of the United States, and to exercise like author-
ity over all places purchased by the consent of the
legislature of the state in which the same shall be,
for the erection of forts, magazines, arsenals, dock-
yards, and other needful buildings."

It will be noted that the acquisition of the lands embraced
in and known as Perry Point was in strict accordance with
the provisions of the Federal Constitution; that is to say,
it was purchased by the United States Government for the
purposes mentioned in the Constitution, and the consent of
the State of Maryland was given to said purchase, as well
as the exclusive jurisdiction thereover being ceded to the
Federal Government as provided by the Act of 1906 above
quoted. The only reservation made by the State of Mary-
land was the right of the officers of the State to serve upon
such sites all civil and criminal process of the courts of
this State. This reservation is found in almost if not all
of the state statutes wherein consent is given to the Federal
Government for the purchase of property within the state.
It has been universally held that such a reservation does
not affect the exclusive jurisdiction over such territory by

the United States. The only purpose and effect of such reservation is to prevent such sites becoming a place of refuge for criminals or service-dodgers, and such service of process is the action of the Federal Government, they recognizing the officers of the state in performing such duties as being officers of the United States for such purpose. *Fort Leavenworth R. R. Co. v. Lowe,* 114 U. S. 525; *United States v. Cornell,* 2 Mason, 60; *Commonwealth v. Clary,* 8 Mass. 72; *Opinions of the Justices,* 1 Metcalf (Mass.), 580; *Brooks Hardware Co. v. Greer,* 111 Maine, 78; *Foley v. Shriver,* 81 Va. 568; *Story, Commentaries on Const.* (4th ed.), vol. 2, pp. 126, 7. In the case of *United States v. Cornell, supra,* quoted with approval in *Fort Leavenworth R. R. Co. v. Lowe, supra,* in speaking of the effect of the reservation as to the service of civil and criminal process, it was said: "It provides only that civil and criminal process issued under the authority of the state, which must, of course, be for acts done within and cognizable by the state, may be executed within the ceded lands, notwithstanding the cession. Not a word is said from which we can infer that it was intended that the state should have a right to punish for acts done within the ceded lands. The whole apparent object is answered by considering the clause as meant to prevent these lands from becoming a sanctuary for fugitives from justice for acts done within the acknowledged jurisdiction of the state. Now, there is nothing incompatible with exclusive sovereignty or jurisdiction of one state that it should permit another state in such cases to execute its process within its limits. And a cession of exclusive jurisdiction may well be made with a reservation of a right of this nature, which then operates only as a condition annexed to the cession, and as an agreement of the new sovereign to permit its free exercise, as *quoad hoc* his own process. \* \* \* And we have not the least hesitation in declaring that the true interpretation of the present proviso leaves the sole and exclusive jurisdiction of Fort Adams in the United States." Acceptance by the United States of such a cession.

is evidenced by the purchase of the property, and even if
this were not true, such acceptance is to be assumed. *Fort
Leavenworth R. R. v. Lowe, supra; Benson v. United States,*
146 U. S. 325.

The provision of the Maryland statute in respect of
divorce, quoted above, is that the bill may be filed in the
court either where the party plaintiff or defendant resides,
or if the party against whom the bill is filed be a non-resident,
then it may be filed where the plaintiff resides.  In this case
the husband filed his original bill in the Circuit Court for
Cecil County on August 10th, 1922, for divorce on the
ground of adultery, and alleged residence in that county.
The wife answered two months later; and over two years
thereafter, no further proceedings having been taken in the
meantime, filed her cross-bill on the ground of abandonment.
The case then proceeded on the cross-bill, without contest.
Testimony taken showed that the couple lived together at
Perry Point for three years, up to October, 1921; that the
wife has since resided in Washington, D. C.; that the hus-
band, after residing at Perry Point for another year, left,
and is now residing in Montgomery County.  There was
no suggestion that he was in the military service, and it
seems rather to have been assumed that he was a civilian
employee.  We shall take this to be a fact.

The question of the right of a resident on a United States
reservation to sue for a divorce in the state court seems not
to have been decided in any one of the many cases on the re-
lations of such residents to the state government.  We are of
the opinion that in view of the Maryland statute in refer-
ence to residence in the state as being a prerequisite to filing
a bill for divorce, the question depends upon whether or not
the government reservation at Perry Point was, at the time
of the bill filed, Maryland territory.  The record does not
disclose that either of the parties to this divorce proceeding
were ever residents of the State of Maryland before the fil-
ing of the bill, unless residence on the government reservation
also makes them residents of Maryland for the purpose of

invoking the aid of the state courts in obtaining a divorce.
The federal constitutional provision speaks only of the power
in Congress to exercise exclusive legislation over the land,
but the courts have, with practical unanimity, held that the
power of exclusive legislation carries with it exclusive juris-
diction, and in many cases have treated the cession as ac-
complishing a thorough separation of the land and its in-
habitants from the state. It has been stated generally that
the states cannot take cognizance of any acts done in the
ceded places after the cession; the inhabitants of those places
cease to be inhabitants of the state and can no longer exer-
cise any civil or political rights under the laws of the state.
*Story's Commentaries on Const.,* sec. 1222; 1 *Kent's Com-
mentaries,* p. 430; *Fort Leavenworth R. R. Co. v. Lowe,
supra; Chicago, Rock Island & Pacific R. R. Co. v. McGlinn,*
114 U. S. 542. It has accordingly been held that residents
on such reservations cannot vote at state elections (*Sinks v.
Reese,* 19 Ohio St. 306), cannot have the benefit of the com-
mon schools of the state for their children, are exempt from
all state and county taxes, are not entitled to receive state
support for the relief of the poor, and are not affected on
the reservation by state liquor laws. *Opinions of the Jus-
tices,* 1 Metc. (Mass.), 580; *United States v. Ames,* 1
Woodb. & Minot, 76; *Commonwealth v. Clary, supra; Fort
Leavenworth R. R. Co. v. Lowe, supra; Maurice v. Worden,*
52 Md. 283. It has also been held that a law concerning
deliveries of stone within Massachusetts had no application
to deliveries at the Charleston Navy Yard (*Mitchell v. Tib-
betts,* 17 Pick. [Mass.] 298); that an incorporated national
home was not subject to attachment because not a corpora-
tion within the state (*Brooks Hardware Co. v. Greer, supra;
Foley v. Shriver, supra*); and that a state law imposing a
penalty for failure to deliver a telegram within the state
could not apply to deliveries within a navy yard (*Western
Union Telegraph Co. v. Childs,* 214 U. S. 274).

From an examination of the authorities on this subject it
appears that there are three principal methods by which the

United States may acquire land within a state. First, the method spoken of as the constitutional method, being that provided by clause 17, section 8, article 1 of the federal constitution, which method is by purchase of the land by the federal government from the owners, with the consent of the state wherein the land is located. Acquisition by this method transfers to the federal government exclusive dominion and jurisdiction thereover for all purposes, with the single exception of the right by the state through its officers to serve civil and criminal process on such reservation. Second, by purchase without obtaining the consent of the state, or by condemnation. In such a case the federal government owns the land thus acquired in the same manner as an individual would, and the state has full jurisdiction thereover for all purposes, with the limitation that its jurisdiction cannot be so exercised as to interfere with the essential and necessary operations of the federal government thereon. Third, where the land acquired by the government was the property of the state, such acquisition being by a cession by the state to the federal government in the nature of a gift. If such method be pursued, the state can annex any conditions or reservations to the cession as it may see fit; and if the federal government takes the land, it accepts it subject to such conditions or reservations. Illustrations of this last method of acquisition are found in the cases of *Fort Leavenworth R. R. Co. v. Lowe, supra; Chicago, Rock Island & Pacific R. R. Co. v. McGlinn, supra*, and *Crook, Horner & Co. v. Old Point Comfort Hotel Co.*, 54 Fed. 604. The first two cases deal with cession by the State of Kansas, of land belonging to that state, to the federal government, with certain reservations as to taxes etc., which reservations were upheld by the Supreme Court; the case last cited being the case of a cession by the State of Virginia of land belonging to it at Fortress Monroe, with the reservation that should any part thereof cease to be used for governmental purposes, it should revert to the state.

In the case of *Divine v. Unaka Nat. Bank*, 125 Tenn. 98, the court held that administration upon the estate of an in-

mate of the National Home for Disabled Volunteer Soldiers might be properly had in the state probate court. In its opinion the court says: "But where land within a state is acquired by the United States, with the consent of a state, then under article 1, section 8, sub-section 17, of the federal constitution, the jurisdiction of the United States is complete and exclusive, and the reservation contained in such grants, to the effect that the state shall have the right to serve civil and criminal process within the territory ceded, is limited to causes of action arising outside of the ceded territory; the purpose of such reservation being to prevent the territory's becoming an asylum for fugitives from justice. This must be understood and applied, however, in the light of the principle of public law that, when the new sovereign has not provided legislation for the territory so acquired, the laws of the former sovereign continue in force so far as needed for the protection and enforcement of the municipal or private rights of individuals residing within the territory." The court then cites *Fort Leavenworth R. R. Co. v. Lowe, supra,* and *Chicago, Rock Island & Pacific R. R. Co. v. McGlinn, supra,* as authority. As above stated, both of these cases deal with land which belonged to the State of Kansas and which was ceded by that state, with certain reservations, to the federal government, and are not cases of land having been acquired in the method prescribed by the federal constitution. They therefore do not appear to be authority for the proposition laid down by the Tennessee court, "that when the new sovereign has not provided legislation for the territory so acquired, the laws of the former sovereign continue in force so far as needed for the protection and enforcement of the municipal or private rights of individuals residing within the territory."

The great weight of authority is to the effect that lands acquired in accordance with the provisions of the federal constitution cease to be a part of the state, and become federal territory, over which the federal government has complete and exclusive jurisdiction and power of legislation. It is therefore clear that persons residing upon the government

reservation at Perry Point are not residents of the State of Maryland for the purpose of exercising the right of franchise, for taxation purposes, or for school purposes, for the reason that they reside upon territory belonging to the United States and not the State of Maryland; and in our opinion, for the same reason, they are not such residents of the state as would entitle them to file a bill for divorce in any of the courts of the state. It might be said that it is an unfortunate situation, where, by reason of the fact that the federal government has failed to make provision for such cases, residents upon such reservations are left without any remedy; but this is a condition wherein the only relief which can be given is by the Federal Congress.

Neither do we think that inconvenience would require us to take a different view. The right of applying for or obtaining a divorce is not a natural right, but is only accorded by reason of the state statutes, and the state has the right to determine who, and upon what conditions they are entitled to the use of the state courts for that purpose. The Legislature in its wisdom has seen fit to require that to entitle a person to file a bill for divorce, such person should be a resident of the state, and there is no sound reason for holding that persons residing upon government reservations are not residents of the state for all other purposes, but are residents for the purpose of divorce actions. They can exercise no political rights in the state; they are not subject to jury duty; neither can they be taxed for the maintenance of the state government, including the courts, and it does not seem unreasonable that the Legislature should require actual residence within the state as a prerequisite for the filing of a bill for divorce. In our opinion the learned chancellor was correct in deciding that the Circuit Court for Cecil County had no jurisdiction in the case, and the decree must be affirmed.

*Decree affirmed, with costs to the appellee.*

BOND, C. J., filed the following separate opinion, in which
URNER, J., concurred.

As I think that the appellant's proof would not support
her cross-bill for divorce if the court had jurisdiction, I con-
cur in the affirmance of the decree against her. But my
conclusion on the question of jurisdiction differs from that
of the majority. On this latter question, I agree that there
is logic in the argument that persons who, because they are
not residents of the state, are not included under the laws
concerning the civil rights and burdens of its residents, must
also be outside of the laws which provide for resort by resi-
dents to the state courts. And broad statements in the deci-
sions, more especially in the earlier ones, on the relations
of inhabitants on reservations to the state governments, add
strength to that argument. But the consequence to the in-
habitants is such that I cannot conceive that it should be
the law, and should have been the law during the more than
a hundred years since national reservations were first estab-
lished, and people began to live on them. The necessity of
the inhabitants is so obvious and imperative that it would
seem to me there must be some adjustment of the law to it,
and that we are not permitted to suppose that the legislative
bodies, state and federal, or the framers of the Constitution
have not intended to meet it. The argument from necessity,
or from inconvenient consequences, in short, seems to me to
compel another construction.

The problem, as I see it, may be stated in this way: The
Maryland statutory provision, Code, art. 16, sec. 37, that
suits for divorce may be instituted where either of the par-
ties resides, is one of several such provisions in our statutes,
with respect to personal relations, rights, and remedies, all
of them designating the particular jurisdictions of the state
in which the proceedings shall be instituted, and all con-
templating that only persons within the state were to be
affected. A guardian for the property of an infant, is for
instance, to be appointed and controlled in "the orphans'
court of the county in which such infant shall reside." Code,

art. 93, sec. 149. Children may be adopted either where the
petitioners for adoption reside, or where the children reside.
Art. 16, sec. 74. Lunacy proceedings may be instituted in
the county or city where the lunatic resides. Art. 59, secs.
1 and 38. For administration of the estates of deceased
owners, wills may be probated, and letters issued, in the
county or city of the mansion house or residence of the late
owner, or the county or city where he died, or where he left
a considerable part of his estate. Art. 93, secs. 14, 251. The
statute giving a cause of action for death by negligence
(article 67) applies only to cases of injury within the state
boundaries. *State, use of Allen, v. Pittsburg & C. R. R. Co.*,
45 Md. 41; *Dronenburg v. Harris*, 108 Md. 597. And the
Workmen's Compensation Act is, generally speaking, limited
to employments within the state. See article 101, secs. 19
and 65. The federal courts have no jurisdiction over divorce,
or over any other of the proceedings here mentioned, except
in so far as federal compensation acts may have been ex-
tended. *Webb v. J. G. White Engineering Co.*, 204 Ala.
429. And it is well known that it has not been contemplated
that the federal courts should have such jurisdiction. And
if the inhabitants of these reservations have been deprived of
the right to resort to the state courts in such proceedings,
then to that extent, and to a very important extent, they are
without the law. They can have none of the relief for which
the remedy of divorce is appropriate, however urgently it
may be needed; and I do not see any escape from the con-
clusion that ownership of their personal property, left at
death, cannot legally be transmitted to their legatees or next
of kin, or to any one at all, that their children cannot have
legal guardians of their property, that they cannot adopt
children on the reservations, that, if any of them should
become insane, they could not have the protection of statu-
tory provisions for the care of the insane—and so on, through
the list of personal privileges, rights and obligations, the
remedies for which are provided for residents of the state.

When we think of the number of people to be left in

this situation on such reservations as that at Perry Point, or that at Edgewood, on such as the Fortress Monroe reservations, with its large population, its private street car lines and other enterprises (*Crook, Horner & Co. v. Old Point Comfort Hotel* Co., 54 Fed. 604), on reservations for large construction work such as that at Muscle Shoals (*Webb v. J. G. White Engineering Co., supra*), and add that for a century and more people have actually lived on such reservations, nevertheless, the opposition of facts and necessity to the view of the law adopted seems to me to be almost, if not quite, irresistible. It has been the practice in the Orphans' Court of Baltimore City to receive probate of wills, and to administer on the estates, of persons resident at Fort McHenry, and it has also, I am informed, been the practice of the Orphans' Court of Anne Arundel County to do the same with respect to wills and estate of persons claiming residence within the United States Naval Academy grounds. We have no information as to the practice elsewhere, but it would seem to me inevitable that the practice of the courts generally must have been to provide such necessary incidents to life on reservations within the respective states. The situation of residents of the District of Columbia, which was carved out of this state, and over which Congress has, by the same clause of the United States Constitution, a "like authority," is so different in fact from that of residents on posts and reservations elsewhere about the country that it may be misleading as an analogy from which original principles, applicable to all alike, may be argued. For a long while the District has been equipped with a complete local government, and freed from all need of state law and state courts. That condition did not exist during the first ten years after the transfer of the District, however. By the statutes which provided for the cession, the laws of Maryland were continued in force in the ceded territory until the national government moved to the site and provided its own laws (Acts of Congress, July, 1790, and February 27, 1801; Laws of Maryland, 1791, ch. 45); and lands within

the District were held liable to attachment out of a state court, in 1797, under the Maryland Act of 1795, ch. 56. *Campbell v. Morris,* 3 H. & McH. 535, 557; *Davidson v. Beatty,* 3 H. & McH. 594. From this it would seem clear that a cession of territory is not an act with fixed, unescapable consequences, but one with only such consequences as may be desired and intended. And this Court has since recognized that even the cession of the District of Columbia left existing a special relationship with the state from which it was carved. In *Reddall v. Bryan,* 14 Md. 444, 478, holding that the supplying of water to the District was a public use for which land in Maryland might be expropriated by the State, the Court said, "Maryland, as one of the states of the union, and in some sense, an integral part of the great public, interested in and constituting a part of the general government, has, by the provision of her Constitution which we have cited, conferred upon the Legislature the power of passing the Act of 1853, and we should have no difficulty in pronouncing that act valid and constitutional, even if there were no other or different relations subsisting between the State of Maryland and the seat of government of the United States, than those which belong to every other state. But, as justly remarked by the judge of the Circuit Court, in his opinion in *United States v. Anderson,* not reported, 'By the Act of 1791, in pursuance of the eighth section of the first article of the Constitution of the United States, the state ceded jurisdiction over its portion of the ten miles square, for certain purposes. * * * The state never intended to abandon all its interest in the District.' The relation, therefore, between the District of Columbia, composed of territory ceded by Maryland for certain purposes only, and the state of whose soil it forms a part, is more intimate and close than that which it bears to any other state."

In other states it has been held by the courts that the inhabitants should be treated as residing within the states for the purpose of probate and administration (*Divine v.*

*Unaka Nat. Bank,* 125 Tenn. 98) ; and statutes giving rights· of action for negligence causing death have been held applicable on reservations (*Hoffman v. Power Co.,* 91 Kans. 450 ;. *McCarthy v. Packard Co.,* 105 App. Div. (N. Y.), 240). A suit in trespass *q. c. f.,* a local action, has been allowed in a state court to test the right to market stalls within the Brooklyn Navy Yard reservation. *Barrett v. Palmer,* 135 N. Y. 336; *cf. Barrett v. Palmer,* 162 U. S. 399. In no case that I have found has an inhabitant on a federal reservation been denied the private laws and remedies of the state court, where Congress has furnished him no other. Where they have been allowed, a basis for the allowance· has been found in the principle of public law that upon the transfer of territory from one government to another, the laws of the first government are continued in force, until superseded by laws of the second. This qualification on the transfer of jurisdiction seems to be recognized in all cases; and it is merely a rule of necessity. *United States v. Percheman,* 7 Peters, 51, 87; *Halleck, International Law*, ch. 34, sec. 14. In international law, it does not, perhaps, authorize a continued resort of inhabitants of the transferred territory to the courts in the remaining territory of their earlier government. Presumably, no question of this· would ordinarily arise, because organized tribunals would' be in operation in the transferred territory; and if the question did arise it would, I presume, be opposed with the principle that the separation from the earlier country is absolute. But, here, we are dealing not with international relations, or a transfer from one country to another, but with only a new division of government between existing governmental agencies in the same country. "Though the jurisdiction and authority of the general government are essentially different from those of the state," the Supreme Court of the United States has said, in *Fort Leavenworth R. R. Co. v. Lowe,* 114 U. S. 525, "they are not those of a different country; and the two, the state and general government,. may deal with each other in any way they may deem best

to carry out the purposes of the Constitution." And see *Reddall v. Bryan, supra.* The necessity which, on the setting aside of a reservation, continues the private laws of the State in force, demands just as clearly, and as imperatively, a continuation of resort to state courts where, only, it is contemplated that those laws may be made effective. The laws and the only courts for their enforcement are inseparable if the laws are to have any substance; and I cannot bring myself to accept the conclusion that the state and the United States have, by separating them, united in placing the inhabitants without the law.

It may be argued with some force that the necessity here is entitled to the same effect in the law as that because of which statutory requirements regarding the election and appointment of officers are qualified by the rule which gives validity to the acts of one who by wrongly assuming to be an officer causes the public to accept him as such, the rule of *de facto* officers (*Mechem, Offices and Officers,* sec. 328; *State v. Carroll,* 38 Conn. 449, 467; *Smith v. Erb,* 4 Gill, 437, 461; *Koontz v. Burgess,* 64 Md. 134; *Izer v. State,* 77 Md. 110; *Knapp v. Knapp,* 149 Md. 263, decided December 9th, 1925); or that because of which a way of necessity is added to a grant of land without any allowance for it in the conveyance. *Jay v. Michael,* 92 Md. 198. The necessity in such cases forms part of the law. But it seems to me the same conclusion is reached better from the standpoint of the intention of the legislative bodies and the framers of the United States Constitution, whose words we are to apply. The argument from inconvenient consequences, in determining the effect of statutory provisions, is, of course, one to be kept carefully within its limits; it does not justify the repeal or the making of a statute. But it does often justify, and require, that general words of statutory provisions be restricted to applications and results which it is conceivable that the enacting bodies may have intended. Decisions of this Court furnish many illustrations of such restriction. *Commercial Association v. Mackenzie,* 85 Md. 132, 137;

*American Casualty Cases*, 82 Md. 535; *Byrne v. Gunning,.* 75 Md. 35; *Farrell v. Mayor,* 75 Md. 493; *Frazier v. Warfield,* 13 Md. 279; *State v. Boyd,* 2 G. & J. 368, 374. And I think the present case requires a like restriction.

Finally, although it was, and still is, provided by statute in this state that, with a few exceptions, irrelevant here, "no person shall be sued out of the county in which he resides" (Code, art. 75, sec. 157), this Court held, in *Maurice v. Worden,* 52 Md. 283, that one who resided within the Naval Academy grounds at Annapolis could be sued in the Circuit Court for Anne Arundel County; and that decision, it seems to me, may be taken as authority for including residents on reservations within those residing in the county for the purpose of bringing suit in the county court.