MAYOR AND ALDERMEN OF ANNAPOLIS ET AL.
*v.* ARUNDELAND, INC.

[No. 179, October Term, 1953.]

*Decided June 25, 1954.*

The cause was argued before BRUNE, C. J., and COL-LINS, HENDERSON and HAMMOND, JJ.

*John B. Wright* and *H. Warren Buckler, Jr.*, with whom were *Niles, Barton, Yost and Dankmeyer* on the brief, for the appellants.

*Richard H. Lerch,* with whom were *Wilbur R. Dulin* and *Wyatt & Jones* on the brief, for the appellees.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal by the City of Annapolis from a decree of the Circuit Court for Anne Arundel County enjoining the City and its Collector and Treasurer from collecting taxes for the years 1951 and 1952 levied by the City against the leasehold interest of the appellee in certain apartment houses built on land owned by the United States, which are leased to the appellee under a long term lease. The right of the State and its appropriate subdivisions to tax the appellee's interest in these apartment houses is provided for under U.S.C.A., Title 34, Section 522 (e), and is not now questioned by the appellee. *Meade Heights, Inc. v. State Tax Comm.,* 202 Md. 20, 95 A. 2d 280.

The controversy in this case centers on whether or not the government property on which these buildings stand is within the City of Annapolis. This question arises from the fact that the land is undoubtedly government property, from the language which now defines the boundaries of the City and from a subsequent statute. The City boundaries are thus described:

"The boundaries of the City of Annapolis shall be as follows: All that area or part of Anne Arundel County, Maryland, included within the metes and bounds hereinafter stated; saving and excepting therefrom all United States Government Property included in said area. Said area being described as follows:" [Here follows a description by metes and bounds which includes within in its outlines the United States Naval Academy and the property now in question.]

The introductory clause of this definition—"The boundaries of the City of Annapolis shall be as follows"— was in Section 1 of the Anne Arundel County Code, 1947 Ed., prior to 1950 and was followed immediately, without any intervening clause, by a complete statement of the metes and bounds of the City. These excluded the United States Naval Academy by describing the boundary of the City as running along the property line of the Academy.

The present language originated in the report of the Annapolis Annexation Charter Commission, which was established pursuant to the Laws of 1949, Chapter 696. The language was adopted *verbatim* in an ordinance of the City passed on April 10, 1950, which was based on the Commission's report, and it was again adopted *verbatim* in an Act of the General Assembly (Laws of 1951, Chapter 569), which repealed and re-enacted with amendments Section 1 of the Anne Arundel County Code (1947 Ed.).

The subsequent statute involved is Chapter 664 of the Laws of 1953, which is claimed by the appellant to be a legislative construction of the 1951 Act favorable to the City's contentions.

The 1950 ordinance was submitted to a referendum vote of qualified voters of the area proposed to be annexed and was approved at an election held on May 23, 1950, and was later held to become effective on January 1, 1951.

The metes and bounds set forth in the ordinance and repeated in the 1951 Act included the area which had formerly been comprised in the City of Annapolis and added some adjacent territory. This enlarged area, if the Naval Academy and other government property were included in it, would be almost identical with that included in the Annapolis Metropolitan Sewerage District, as enlarged in 1949.

The area now in dispute lay outside the old City limits and had for some years been the Naval Academy golf course.

The agreement pursuant to which the apartment houses now involved in controversy were built by the appellee and leased to it was dated August 30, 1950. It was executed by the Government on that date and by the appellee on September 11, 1950, and had evidently been the subject of negotiations for some time.

The appellee, in advance of concluding its agreement with the Government, but after the referendum vote approving the annexation ordinance, made arrangements with the Annapolis Water Company to obtain water for the projected apartments "upon the same conditions and price that the consumers in the City of Annapolis pay for the water furnished them." It likewise made arrangements with the Annapolis Metropolitan Sewerage Commission for the use of its facilities. For the fiscal year beginning May 1, 1950, the charge for the latter was to be "the current sewerage tax of $0.34 per $100 of assessed value on its proposed housing project * * *; which tax is the same rate charged on all property in the Annapolis Metropolitan Sewerage District." For later years, the rate was to be subject to change but was to be at the same rate for all property in the District. In 1950 the Annapolis Water Company was, and long had been, a part of the municipal government of Annapolis. The Sewerage Commission was also absorbed by the City in 1951 following the enlargement of the city limits and pursuant to the Laws of 1951, Chapter 493. Prior to its absorption by the City, the Commission was authorized to call upon the City and the County Commissioners to impose taxes upon properties within their respective jurisdictions to pay the principal of and interest on bonds issued by the Commission and to pay its operating expenses.

The only municipal services furnished to the appellee and its tenants by the City are water and sewerage. The appellee also has an agreement to dump garbage on the City dump at a fixed price per load. In accordance with Navy requirements, fire and police protection

are furnished by the Navy, and City water is not used in the fire hydrants.

The appellee has paid for its use of the sewerage system at the rate fixed by the 1950 arrangement with the old Commission. The appellant asserts that for 1951 this was paid to the City as a tax, and that nothing has been paid since.

Chapter 569 of the Laws of 1951 made a change in the election districts of Anne Arundel County and made the sixth district coincide with the City limits of Annapolis as defined in the same statute, and modified the boundaries of any other election district accordingly. The appellee has paid County taxes for the years 1952 and 1953 at the rate applicable to the sixth district without objecting thereto. (This is hardly surprising since the rate is lower in the sixth district than in others because of the services supposedly rendered by the City of Annapolis and not by the County.)

The main contention revolves about the terms in which the limits of Annapolis are defined. The appellant claims that the exception of "United States Government Property included within said area"—i.e., within the area described by metes and bounds—refers to a type or kind of property, or is only a precautionary clause showing that those who adopted it were aware of the limitations upon the powers of the State with regard to property owned by the United States. The appellee contends that the exclusion is expressed in terms of area and that there is no reason to depart from its literal meaning.

There is no dispute about the complete jurisdiction of the United States over the property which it owns. See *S.R.A., Inc. v. Minnesota*, 327 U. S. 558, but that case and others therein cited show that the possibility of repossession by the United States will not prevent a tax sale under which the paramount rights of the United States are protected. Among the cases cited is *Baltimore Shipbuilding Co. v. Baltimore*, 195 U. S. 375, which affirmed the decision of this Court in 97 Md. 97.

The testimony of the Chairman of the Annexation Commission shows that while the Commission was functioning he was unaware of the proposed apartment house development which was later undertaken by the appellant, Arundeland, Inc. In response to a question by the Court he said, "No, sir, we didn't consider that at all. We weren't interested." It is hard to deduce an intent one way or the other from a combination of lack of knowledge and indifference.

The administrative practice upon which the appellant relies seems wholly inconclusive. The County blew first one way and then the other on whether or not the apartment houses were in the second or the sixth election district, and there is nothing to show even by whose authority a shift of the assessment was made from the second to the sixth district. The administrative construction of the Annapolis Water Company (really the City itself) in August, 1950, in a letter signed by the Mayor seems to have assumed that the new development was not to be in the City. The action of the Sewerage Commission was apparently similar.

Chapter 664 of the Laws of 1953 enacted Section 1A of the Anne Arundel County Code. It provides that "Notwithstanding the exclusion in the preceding section [as enacted by Chapter 569 of the Laws of 1951] from the jurisdiction * * * of the City of Annapolis of all United States Government property included within the boundaries of said City as defined in said section, any buildings * * * or other improvements owned or acquired on any such property by any person or corporation other than" the United States or the State of Maryland, or an agency of either, "pursuant to any agreement [or] lease * * * from the United States shall be subject to taxation by the * * * City of Annapolis * * * if it shall be determined that any such buildings or improvements are subject to taxation by * * * Anne Arundel County and by the State of Maryland." This enactment shows such an awareness of the tax consequences which might depend upon whether government property was

or was not included in the City of Annapolis as to suggest that it was inspired by the *Meade Heights* case, which was awaiting decision when this legislation was introduced. Whether this was the actual fact or not, a subsequent legislative construction is not binding. *Marburg v. Mercantile Trust Co.,* 154 Md. 438, 140 A. 836; *Gibson v. State,* 204 Md. 423, 104 A. 2d 800.

The 1951 statute and, to a lesser degree, the 1953 Act which is said to construe it, stand in marked contrast with the Acts which defined the Annapolis Metropolitan Sewerage District. That District was established by Chapter 104 of the Laws of 1931, by Section 1 of which it was provided:

> "That all that part of Anne Arundel County within the bounds comprising all of the drainage areas of Back Creek, Spa Creek, Dorseys Creek, and those parts of the drainage areas of Weems Creek and the Severn River, *in which are located* the communities of Annapolis, Eastport, Germantown, West Annapolis, Wardour, the *U. S. Naval Academy and other federal properties,* be and the same is hereby incorporated for the purposes hereinafter set forth, to be known as the 'Annapolis Metropolitan Sewerage District.'" (Emphasis supplied).

Chapter 2 of the Laws of 1933 amended this Section by adding to the quoted language:

> "which said District shall constitute a political subdivision of the State of Maryland, and a body corporate, bounded and described as follows:"

A lengthy description by metes and bounds then followed.

Chapter 758 of the Laws of 1949 (approved the same day as Chapter 696 providing for the Annexation Commission), among other things, extended the boundaries of the District. Another drainage area and several more communities were mentioned, and a long description by metes and bounds followed. The words "in which are located * * * U. S. Naval Academy and other

federal properties" remained unchanged. (In view of
the statement in the title of Chapter 758 of the Laws
of 1949 that the District was to be enlarged, it is some-
what odd to find that the stated area is the same in
the 1949 Act as in the 1933 Act.)

It can hardly be supposed that the members of the
Annexation Commission, the Mayor and Aldermen of
Annapolis or the Legislature were unaware of the pro-
visions defining the area of the Metropolitan Sewerage
District. The appellant's brief recognizes the explicit
inclusion of federal property in the District and seeks
to deduce from that fact an intention to include it in
the City, because the description of the City limits
(without giving any effect to the exclusion clause) in-
cludes substantially the same area as the Metropolitan
Sewerage District. We think that the correct inference
to be drawn from the contrasting language is the exact
opposite. In the District description we have an express
inclusion; in the City description we have an express
exclusion.

The report of the Annexation Commission recom-
mended the inclusion in the City of substantially that
portion of the Metropolitan Sewerage District which
was then outside the existing city limits. In support
of the proposed boundaries which the Commission deemed
"logical and proper," it stressed the singleness of the
community in various respects, a considerable number
of which seems clearly inapplicable in the case of the
Naval Academy. It seems hard to deduce from such a
recommendation and from the reasons adduced for it
any intention to include the Naval Academy or other
government property in the new City limits; and these
passages in the Annexation Commission's report are not
sufficient to overcome the plain language of exclusion
of "all United States Government Property" which ap-
pears in both the ordinance of 1950 and the Act of the
Legislature of 1951.

This construction is somewhat fortified by the action
of the City with regard to water in making arrange-

ments with the Appellee in the summer of 1950. It is also strengthened by the provisions of Chapter 696 of the Laws of 1949 which called for a referendum vote of the qualified voters in the area which the Annexation Commission might recommend for annexation to the City. As the Chancellor pointed out in his opinion, "The Legislature knew that residents of government property could not vote."

We also agree with his comments on the effect of Chapter 664 of the Laws of 1953. If the ordinance of 1950 and Chapter 569 of the Laws of 1951 had included the Naval Academy and other government property in the City limits of Annapolis, the statute was unnecessary. If they did not, it could hardly be contended, and it is not in fact contended, that the 1953 Act itself made any change in the boundaries. As we have already pointed out, even if the 1953 Act is considered as a legislative construction of the 1951 Act, while it would be entitled to careful consideration, it is not controlling. We think that the 1950 ordinance and the 1951 statute are not susceptible of the construction which the appellant contends should be placed on them. After quoting the description in the annexation ordinance and the Act of 1951, the Chancellor said, and we agree with his views: "Neither the Commission, nor the Legislature, when using the above quoted language, were dealing with *types* of property or interests in property; they were dealing with the boundaries of a City. What was excluded was not the government's interest in the property (that was already excluded), but the area of the property. The words of the report, and of the Act, are, to me, clear and unambiguous. There was no necessity to exclude the City's 'jurisdiction' over government property within its boundaries. That was already adequately taken care of by the constitution of the United States, and by the laws enacted pursuant thereto. (See *Lowe v. Lowe*, 150 Maryland 592.)"

It remains to be said only that while we hold that neither the Naval Academy tract nor other Government

property within the area bounded by the metes and bounds, courses and distances set out in the 1951 Act is included in the limits of the City of Annapolis set forth in that Act, we are not deciding any question pertaining to the power of the Legislature to include those areas within the City limits subject, of course, to the paramount jurisdiction and rights of the United States.

The decree of the Circuit Court on the case presented must be affirmed.

*Decree affirmed, with costs.*