83 S.E.2d 127 (1954)
ADAMS et al.
v.
LONDEREE et al.
No. 10670.
Supreme Court of Appeals of West Virginia.
Submitted March 30, 1954.
Decided April 2, 1954.
Opinion Filed April 23, 1954.
Dissenting Opinion July 27, 1954.
*129 H. D. Rollins, Charleston, for relators.
Charles M. Love, Jr., Martin C. Bowles, Charleston, for respondents.
*128 GIVEN, President.
In this original proceeding in mandamus, the relators, W. P. Adams, Homer Morris, Duffy Mullins, J. C. Wells and J. H. Young, prayed that defendants S. H. Mullins and Willis A. Taylor, ballot commissioners of the City of South Charleston, be directed to strike the name of defendant Joseph W. Londeree, Democratic candidate for Mayor of South Charleston, from the ballot for a general election to be held for that city, and that defendant Paul E. Wehrle, clerk, and as such registrar of voters for Kanawha County, wherein that city is situated, be directed to strike the name of Joseph W. Londeree from the voters' registration records. Relators prosecute this action as residents *130 and voters of the City of South Charleston, for the benefit of themselves and all other residents and voters of South Charleston.
The questions posed having been decided by the Court, an order was heretofore entered denying the writ. This opinion is filed in accordance with an announcement made at the time of the entry of the order.
The proceeding was heard upon the petition of relators; the demurrer and answer thereto of defendant Londeree; the answer thereto of defendant Paul E. Wehrle, clerk; the demurrer and replication of relators to the answer of defendant Londeree; the depositions taken and filed on behalf of relators; and upon briefs and oral arguments.
In the certificate of Londeree announcing his candidacy for the nomination of mayor, he gave his address "as 32 Rhodes Avenue in said City". The petition alleges "that the said address, and it was the correct address of said Londeree at said time, is within the bounds of said United States Naval Reservation". The answer of Londeree "admits that at the time of his nomination and for several years prior thereto he was a resident of that part of the City of South Charleston included in the United States Naval Reservation and that he did give his address as 32 Rhodes Avenue in said city and that such address is correct and that said address is within the bounds of the said United States Naval Reservation * * *".
Londeree is not a member of the armed forces and is not a civilian employee of any agency or department of the United States Government. At the time of filing the certificate of candidacy he, with his family, occupied one of a number of residential units, constructed and maintained by the United States upon the reservation, leased or rented to civilians, for a consideration, when not required for use of military personnel. The naval reservation is wholly within the exterior boundary lines of the City of South Charleston. Some time after Londeree announced his candidacy for nomination for mayor, he moved from the reservation to an address within the City of South Charleston, but he will have resided outside of the reservation less than sixty days next preceding the date fixed by law for the holding of the election.
Defendants contended that the extraordinary remedy of mandamus would not lie for the purpose of determining the qualification of defendant Londeree, prior to his election, since it was not certain that he would be elected. In other words, they contend that the institution of the proceeding was premature. We are of the opinion, however, that the institution of the proceeding was not premature.
Section 9 of the city charter provides that "No persons shall be eligible to the office of Mayor, Treasurer, Recorder, or Councilman, unless at the time of his election he is legally entitled to vote in the town election for a member of the Common Council, and he was for the preceding year assessed with taxes upon real or personal property within said town of the assessed aggregate of at least One Hundred ($100.00) Dollars and shall have actually paid the taxes so assessed." It is significant that the qualifications must exist "at the time of his election", not at some future time or upon the happening of some future event. The provision is clear. It should be applied as written. In State ex rel. Morrison v. Freeland, W.Va., 81 S.E.2d 685, 686, we held: "2. Where a statute requires that a person to be elected to office shall have a specific qualification at the time of his election, the requirement is not satisfied by the removal of the disqualification after election." This being true, since the contest can not arise until after the election, to hold that mandamus can not be invoked in such cases as to a nominee for office would have the effect of denying any remedy prior to the election and, where the candidate elected could not qualify as to the office sought, would have the effect of rendering the election as to that office a nullity. Surely no such result could have been contemplated. It would not tend to induce orderly elections. In State ex rel. Harwood v. Tynes, W.Va., 70 *131 S.E.2d 24, and in State ex rel. McKnight v. Board of Ballot Commissioners of Wetzel County, 86 W.Va. 496, 103 S.E. 399, we did hold that: "When a candidate for a nomination in a primary election files a certificate with the clerk of the circuit court, from which it appears that he is eligible to hold the office for which he is a candidate, the board of ballot commissioners have no authority to institute an inquiry for the purpose of determining the question of his legal qualifications to hold such office. The duty of said board is to place his name upon the ballot and allow the question of his eligibility to be determined by a competent tribunal, should he be elected thereto."
The question involved there, however, related to the jurisdiction of the board of ballot commissioners to determine the qualification of a candidate in a primary election, where the certificate of candidacy was regular and showed on its face that the candidate was qualified to hold the office for which he sought the nomination. No jurisdiction to determine such question was vested in the board of ballot commissioners by any statute. Therefore, it had no jurisdiction to make any independent investigation in order to determine such qualification. But lack of jurisdiction of such a board cannot be determinative of jurisdiction of a court having original jurisdiction in mandamus. Defendant members of the board of ballot commissioners hold office by virtue of the election laws, and Code, 3-5-41, provides that "Any officer or person, upon whom any duty is devolved by this chapter [on Elections], may be compelled to perform the same by writ of mandamus." While the chapter mentioned relates particularly to elections other than municipal elections, undoubtedly the provision quoted applies to municipal elections, by virtue of Code, 8-3-15, dealing with municipal elections. It must not be overlooked, however, that a relator in such a proceeding must show a clear legal right, and that courts are not warranted in issuing the writ unless a clear legal right exists.
This Court has carefully pointed out in its opinions that the wording of a particular statute relating to qualifications of candidates is controlling in determining the time when the qualifications must exist. The question was recently considered in State ex rel. Morrison v. Freeland, supra, and need not be further considered here. See Slater v. Varney, 136 W.Va. 406, 68 S.E.2d 757; Dryden v. Swinburne, 20 W. Va. 89.
The further contention is made by defendants that the remedy of an election contest afforded by Code, 3-9-1, instituted and prosecuted before a city council as to city officials, is adequate for determination of qualifications of a candidate, and that any question as to qualification of Londeree lies exclusively within the jurisdiction of the city council of South Charleston. They rely on cases like State ex rel. Harwood v. Tynes, supra; State ex rel. Jones v. Ingram, 135 W.Va. 548, 63 S.E.2d 828; Evans v. Charles, 133 W.Va. 463, 56 S.E.2d 880; and Martin v. White, 74 W.Va. 628, 82 S.E. 505.
It is true, as pointed out in some of the cases just cited, that in some instances the qualification of a candidate may be determined in an election contest proceeding. Code, Chapter 3, Article 9. To say that it is the only available and adequate remedy, however, obviously would deny courts having original jurisdiction of such proceedings as mandamus, quo warranto or prohibition, any jurisdiction as to questions concerning qualifications of candidates for nomination or election to office. The cases cited are sufficient authority to the contrary. See State ex rel. Morrison v. Freeland, supra.
We conclude, therefore, that the action of mandamus, in the circumstances of this case, was available to relators, and that it was not prematurely instituted.
The remaining question to be answered by the Court relates to the qualification of Londeree to be elected as Mayor of South Charleston. The contention of relators was that since Londeree resided on the naval reservation for a number of years prior to becoming a candidate, the reservation being *132 within the exclusive jurisdiction of the United States and not a part of the State of West Virginia, he was not a resident of the State at the time he filed his certificate of candidacy, and could not have become a person who had resided in West Virginia for a period of one year immediately prior to the time he would be "elected" to the office which he seeks. In other words, not being a resident of the State for a period of one year, he could not qualify for the office.
Section 4 of Article IV of the State Constitution provides that "No person, except citizens entitled to vote, shall be elected or appointed to any State, county, or municipal office * * *". Section 1 of Article IV of the State Constitution provides that "The * * * citizens of the State shall be entitled to vote at all elections held within the counties in which they respectively reside; but no person * * * who has not been a resident of the State for one year, and of the county in which he offers to vote, for sixty days next preceding such offer, shall be permitted to vote while such disability continues; but no person in the military, naval or marine service of the United States shall be deemed a resident of this State by reason of being stationed therein." Obviously, the question reduces itself to whether Londeree was a citizen and resident of the State, within the meaning of the State constitutional provision, while residing on the reservation. The answer to that question will become apparent if we can determine the true character or effect of the acquisition by the United States of the area comprising the reservation.
Title to the land within the reservation was acquired from the individual owners about 1917, prior to the incorporation of the City of South Charleston. By Sections 4 and 5 of Chapter 20 of the 1881 Acts of the Legislature, provisions were made for the acquisition of lands within the State by the United States. These sections read: "4. In pursuance of the seventeenth clause of the eighth section of the first article of the constitution of the United States, the consent of the Legislature of West Virginia is hereby given to the purchase or condemnation, whether heretofore or hereafter made or had by the government of the United States, or under its authority, of any tract or parcel of land within the limits of the State, for the purpose of erecting thereon light-houses, beacons, signal stations, post offices, custom houses, court houses, locks, dams, and works for the improvement of the navigation of any water course, and other needful buildings or structures. The evidences of title to such land shall be recorded as in other cases. But the quantity of land to be so acquired shall not exceed twenty-five acres in any one place." "5. The State of West Virginia reserves the right to execute process, civil or criminal, within the limits of any lot or parcel of land so acquired by the United States as aforesaid."
Before the acquisition by the United States of title to the area comprising the reservation, by Chapter 5 of the 1917 Acts of the Legislature, Second Extraordinary Session, Section 4 was amended to read, in so far as material here: "In pursuance of the seventeenth clause of the eighth section of the first article of the constitution of the United States, the consent of the legislature of West Virginia is hereby given to the purchase or condemnation or acceptance as a gift, whether heretofore or hereafter made or had to the government of the United States, or under its authority, of any tract or parcel of land within the limits of the state, for the purpose of erecting thereon light houses, beacons, signal stations, post offices, custom houses, court houses, locks, dams, works for the improvement of the navigation of any watercourse, armor plate manufacturing plants, projectile factories or factories of any kind or character, or any other needful buildings or structures or proving grounds, or work of public improvement whatever, or for any other purpose for which the same may be needed or required by the government of the United States. The evidence of title to such land shall be recorded as in other cases."
Section 4, as amended, and Section 5, quoted above, were in force at the time the *133 South Charleston Reservation was ceded to the United States.
Subsequent to the acquisition by the United States, with the adoption of the 1931 Code, Sections 4 and 5, quoted above, were revised and, in so far as material here, read: "4. The consent of this State is hereby given to the acquisition by the United States, or under its authority, by purchase, lease, condemnation, or otherwise, of any land acquired, or to be acquired in this State by the United States, from any individual, body politic or corporate, for sites for lighthouses, beacons, signal stations, post offices, customhouses, courthouses, arsenals, soldiers' homes, cemeteries, locks, dams, armor plate manufacturing plants, projectile factories or factories of any kind or character, or any needful buildings or structures or proving grounds, or works for the improvement of the navigation of any watercourse, or work of public improvement whatever, or for the conservation of the forests, or for any other purpose for which the same may be needed or required by the government of the United States. The evidence of title to such land shall be recorded as in other cases * * *. Concurrent jurisdiction with this State in and over any land so acquired by the United States shall be, and the same is hereby, ceded to the United States for all purposes; but the jurisdiction so ceded shall continue no longer than the United States shall be the owner of such lands, and if the purposes of any grant to the United States shall cease, or the United States shall for five consecutive years fail to use any such land for the purposes of the grant, the jurisdiction hereby ceded over the same shall cease and determine, and the right and title thereto shall reinvest in this State. The jurisdiction ceded shall not vest until the United States shall acquire title of record to such land. Jurisdiction heretofore ceded to the United States over any land within this State by any previous acts of the legislature shall continue according to the terms of the respective cessions." "5. The State of West Virginia reserves the right to execute process, civil or criminal, within the limits of any lot or parcel of land heretofore or hereafter acquired by the United States as aforesaid, and such other jurisdiction and authority over the same as is not inconsistent with the jurisdiction ceded to the United States by virtue of such acquisition." See Sections 3 and 4 of the 1931 Code.
Section 8 of Article I of the United States Constitution, in so far as material, reads: "The Congress shall have the Power * * * To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings * * *".
At the time of the acquisition of title to the lands within the reservation, an Act of Congress provided: "No public money shall be expended upon any site or land purchased by the United States for the purposes of erecting thereon any armory, arsenal, fort, fortification, navy-yard, custom-house, light-house, or other public building, of any kind whatever, until the written opinion of the Attorney-General shall be had in favor of the validity of the title, nor until the consent of the legislature of the State in which the land or site may be, to such purchase, has been given * * ". Revised Statutes, Section 355. The provision as amended now reads: "* * * Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such *134 lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted." 50 U.S.C., Section 175, 50 U.S.C.A. § 175.
In considering the question posed, we need not consider the different methods whereby the Federal Government may acquire title to State lands, or the power or jurisdiction of the Federal Government over such lands, other than the method whereby title is acquired pursuant to the consent of the Legislature of the State. The basis and, to some degree, the effect of the "consent" provision of such statutes is stated in Fort Leavenworth Railroad Co. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 998, 29 L.Ed. 264, in this language: "This power of exclusive legislation is to be exercised, as thus seen, over places purchased, by consent of the Legislatures of the states in which they are situated, for the specific purposes enumerated. It would seem to have been the opinion of the framers of the constitution that, without the consent of the states, the new government would not be able to acquire lands within them; and therefore it was provided that when it might require such lands for the erection of forts and other buildings for the defense of the country, or the discharge of other duties devolving upon it, and the consent of the states in which they were situated was obtained for their acquisition, such consent should carry with it political dominion and legislative authority over them. Purchase with such consent was the only mode then thought of for the acquisition by the general government of title to lands in the states. Since the adoption of the constitution this view has not generally prevailed. Such consent has not always been obtained, nor supposed necessary, for the purchase by the general government of lands within the states. If any doubt has ever existed as to its power thus to acquire lands within the states, it has not had sufficient strength to create any effective dissent from the general opinion. The consent of the states to the purchase of lands within them for the special purposes named is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private individuals.
"But not only by direct purchase have the United States been able to acquire lands they needed without the consent of the states, but it has been held that they possess the right of eminent domain within the states, using those terms, not as expressing the ultimate dominion, or title to property, but as indicating the right to take private property for public uses when needed to execute the powers conferred by the constitution; and that the general government is not dependent upon the caprice of individuals or the will of state legislatures in the acquisition of such lands as may be required for the full and effective exercise of its powers. This doctrine was authoritatively declared in Kohl v. U. S., 91 U.S. 367 [23 L.Ed. 449] * * *".
The Fort Leavenworth Railroad Co. case involved the payment of certain taxes assessed by the State against property situated on the Fort Leavenworth Military Reservation. Title to the land within the reservation was acquired pursuant to an Act of the Legislature of Kansas ceding "`jurisdiction to the United States over the territory of the Fort Leavenworth military reservation,'" but saving to the State the right to "`serve civil or criminal process within said reservation * * * and * * the right to tax railroad, bridge, and other corporations, their franchises and property, *135 on said reservation'". The saving to the State was held valid and the tax assessment against the railroad company upheld. It must be conceded, however, that statements found in the opinion, and also in other opinions, can possibly be construed to mean that where land is acquired by the United States pursuant to Clause 17 of Section 8 of Article I of the Federal Constitution, for the purposes therein mentioned, the Federal Government will be presumed to have accepted full and complete jurisdiction over the territory, not merely "Power * * * to exercise exclusive Legislation in all Cases whatsoever * * *" as to the purposes for which the United States acquired the land. It must also be conceded that some of the authorities consider the holdings in the older cases to mean that the Federal Government becomes sole and absolute sovereign over such territory, in all respects and as to all purposes, not merely as to the purposes for which Clause 17 authorized the acquisition, and that it becomes such, without any acceptance, by Act of Congress or otherwise, upon the mere acquisition of title to the property. See Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091; United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761; Arlington Hotel Co. v. Fant, 278 U.S. 439, 49 S.Ct. 227, 73 L.Ed. 447; McMahon v. Polk, 10 S.D. 296, 73 N.W. 77, 47 L.R.A. 830; In re Town of Highlands, Sup., 22 N.Y.S. 137; Arledge v. Mabry, 52 N.M. 303, 197 P.2d 884; State ex rel. Wendt v. Smith, Ohio App., 103 N.E.2d 822; Sinks v. Reese, 19 Ohio St. 306, 2 Am.Rep. 397; Kiker v. City of Philadelphia, 346 Pa. 624, 31 A.2d 289, certiorari denied 320 U.S. 741, 64 S.Ct. 41, 88 L.Ed. 439.
The reasoning usually followed in the cases was that the ceding of land to the United States ousted the State as a sovereign and constituted the United States the sole sovereign as to such territory, following by analogy, the ceding of territory by one nation to another nation, whereby the laws of the ceding nation were superseded entirely by the laws of the nation to which the territory was ceded. See Chicago, Rock Island & Pacific Railway Co. v. McGlinn, 114 U.S. 542, 5 S.Ct. 1005, 29 L.Ed. 270. Is not the analogy inept? Our American form of government is not two separate and distinct sovereigns. It is, in fact, as all recognize, a single sovereign, of dual aspect. Within its own field the Federal Government is absolutely sovereign. It is just as true, however, that a State within its own field is absolutely sovereign. It is also true that the sovereign power of the United States and of the different States, respectively, is concurrently exercised over all the territory of the several States. These facts are demonstrated almost daily when the Federal Courts refuse to hear matters of litigation where no Federal question is involved, or where a State Court refuses to hear questions cognizable only under Federal laws. The State and the United States constitute one, and only one, sovereign. This being true, is there any reason or necessity for holding that the Federal Government must necessarily oust the State of its sovereignty as to those matters constituting no impediment or interference with the use by the Federal Government of the land for the purpose or purposes for which it is acquired pursuant to the provisions of Clause 17? The question is not new. It has been considered often and, except in some of the older cases, usually answered in the negative.
Thus, in James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 212, 82 L.Ed. 155, one of the questions involved related to the validity of a tax assessment by the State against the Dravo Contracting Company "As to work done within the exterior limits of West Virginia, the question is whether the United States has acquired exclusive jurisdiction over the respective sites. Wherever the United States has such jurisdiction the state would have no authority to lay the tax". The assessment was upheld. In discussing the question, Mr. Chief Justice Hughes, in the opinion of the Court, uses this language: "It is not questioned that the state may refuse its consent and retain jurisdiction consistent with the governmental purposes for which *136 the property was acquired. The right of eminent domain inheres in the federal government by virtue of its sovereignty, and thus it may, regardless of the wishes either of the owners or of the states, acquire the lands which it needs within their borders. Kohl v. United States, 91 U.S. 367, 371, 372, 23 L.Ed. 449 [451]. In that event, as in cases of acquisition by purchase without consent of the state, jurisdiction is dependent upon cession by the state and the state may qualify its cession by reservations not inconsistent with the governmental uses. Story on the Constitution, volume 2, § 1227; Kohl v. United States, supra, 91 U.S. 367, at page 374, 23 L.Ed. 449 [452]; Ft. Leavenworth R. Co. v. Lowe [114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264], supra; Surplus Trading Co. v. Cook [281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091], supra; United States v. Unzeuta [281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761], supra. The result to the federal government is the same whether consent is refused and cession is qualified by a reservation of concurrent jurisdiction, or consent to the acquisition is granted with a like qualification. As the Solicitor General has pointed out, a transfer of legislative jurisdiction carries with it not only benefits, but obligations, and it may be highly desirable, in the interest both of the national government and of the state, that the latter should not be entirely ousted of its jurisdiction. The possible importance of reserving to the state jurisdiction for local purposes which involve no interference with the performance of governmental functions is becoming more and more clear as the activities of the government expand and large areas within the states are acquired. There appears to be no reason why the United States should be compelled to accept exclusive jurisdiction or the state be compelled to grant it in giving its consent to purchases." We do not overlook the fact that the land acquired by the United States, upon which the work was performed by Dravo, was acquired under the later statute whereby concurrent jurisdiction was saved to the State, but the case seems clear authority for the position that the State may reserve such rights, in the ceding of its lands to the United States, as it may deem wise, and for the further position that there must be an acceptance by the United States of such rights as it desires to exercise before it can be charged with exclusive power to legislate.
In Carnegie-Illinois Steel Corporation v. Alderson, 127 W.Va. 807, 34 S.E.2d 737, certiorari denied 326 U.S. 764, 66 S.Ct. 146, 90 L.Ed. 460, this Court held: "2. A concern engaged exclusively in producing war material for the use of the United States Government at a time of national emergency, with machinery and in a plant leased from the Government and under contracts providing a fixed unit price to be paid by the Government, is not to be treated as exercising a sovereign function of the Federal Government and therefore exempt from a state tax, in the absence of an Act of Congress recognizing the claimed exercise." There were involved in the case the assessment and collection of a tax by the State against a taxpayer operating as a lessee of the United States upon the very reservation involved in the instant proceeding. The tax was held valid by virtue of the Act of Congress commonly referred to as the "Buck Act", Public Act No. 819, 54 Statutes 1059, 4 U.S.C., Section 14. The significance of the holding here is that any "power to legislate" as to the assessment and payment of the tax acquired by the United States by virtue of the "Buck Act" has been re-ceded to the State, so that the defendant Londeree would be liable for a like tax and, if not entitled to vote, we would have a clear case of taxation without representation, brought about by deliberate actions of the State and the United States. Assuming that the consent of the State to the acquisition of the reservation here involved deprived the State of all rights of sovereignty over the territory therein, has not the United States receded such sovereignty to the State, in so far as taxation and the right to vote are concerned?
In Silas Mason Co. v. Tax Commission of the State of Washington, 302 U.S. 186, 58 S.Ct. 233, 244, 82 L.Ed. 187, the question of exclusive jurisdiction of the United States over territory acquired pursuant to *137 authority of a statute of the State of Washington, very similar if not to the precise effect as that of the West Virginia statute presently involved, was considered. In the opinion, Mr. Chief Justice Hughes stated: "Even if it were assumed that the state statute should be construed to apply to the federal acquisitions here involved, we should still be met by the contention of the Government that it was not compelled to accept, and has not accepted, a transfer of exclusive jurisdiction. As such a transfer rests upon a grant by the State, through consent or cession, it follows, in accordance with familiar principles applicable to grants, that the grant may be accepted or declined. Acceptance may be presumed in the absence of evidence of a contrary intent, but we know of no constitutional principle which compels acceptance by the United States of an exclusive jurisdiction contrary to its own conception of its interests. The mere fact that the Government needs title to property within the boundaries of a State, which may be acquired irrespective of the consent of the State (Kohl v. United States, 91 U.S. 367, 371, 372, 23 L.Ed. 449 [451]), does not necessitate the assumption by the Government of the burdens incident to an exclusive jurisdiction. We have frequently said that our system of government is a practical adjustment by which the national authority may be maintained in its full scope without unnecessary loss of local efficiency. In acquiring property, the federal function in view may be performed without disturbing the local administration in matters which may still appropriately pertain to state authority * * *".
In Atkinson v. State Tax Commission of Oregon, 303 U.S. 20, 58 S.Ct. 419, 420, 82 L.Ed. 621, land was ceded to the United States under a state statute whereby the United States could acquire exclusive jurisdiction of certain lands. The question before the Court related to the validity of personal income taxes assessed under Oregon law arising from work done upon land acquired by the United States. In holding the tax valid, the Supreme Court of Oregon stated: "`The mere fact that there may be on the statute books of the state a general law, such as section 60-1303, Oregon Code 1930, consenting to the purchase of land by the United States and granting to the national government the right to exercise exclusive jurisdiction thereover, does not imply that over all lands purchased by the national government in the state after the enactment of such law the state is divested ipso facto of sovereignty, and exclusive control over the acquired area is assumed by the federal government. In the instant case there is nothing to indicate that the federal government desires to exercise exclusive legislative jurisdiction over the land purchased by it within the Bonneville project * * *". In upholding the validity of the tax and in affirming the judgment of the Supreme Court of Oregon, the Federal Supreme Court stated: "* * * If, however, exclusive jurisdiction, although offered, was not accepted by the United States, there is no warrant for the conclusion that the state did not retain its territorial jurisdiction over the area in question so far as its exercise involved no interference with the carrying out of the federal project. And as we have decided that there is no such interference through the enforcement of a tax such as is here assailed, we find no ground for overruling the decision of the state court."
In Sadrakula v. James Stewart & Co., 280 N.Y. 730, 21 N.E.2d 217, it was held that the labor laws of the State of New York remained in force within territory over which the United States had obtained exclusive jurisdiction. On affirming, the United States Supreme Court stated: "It is now settled that the jurisdiction acquired from a state by the United States whether by consent to the purchase or by cession may be qualified in accordance with agreements reached by the respective governments. The Constitution does not command that every vestige of the laws of the former sovereignty must vanish. On the contrary its language has long been interpreted so as to permit the continuance until abrogated of those rules existing at the time of the surrender of sovereignty which govern the rights of the occupants of the territory *138 transferred. This assures that no area however small will be left without a developed legal system for private rights * * *". James Stewart & Co. v. Sadrakula, 309 U.S. 94, 60 S.Ct. 431, 433, 84 L.Ed. 596.
In Arapajolu v. McMenamin, 113 Cal.App.2d 824, 249 P.2d 318, 323, 34 A.L.R. 2d 1185, the Court had under consideration questions relating to the rights of persons residing upon reservations acquired by the United States under a consent statute to the same practical effect as the applicable West Virginia statute. The Court, in holding the persons entitled to vote, stated: "Respondents argue in their brief: `The states could have reserved the right to vote at the time of original cession where such right did not conflict with federal use of the property * * * but did not do so.' We cannot follow the force of this argument. The State of California did not relinquish to the United States the right of citizens resident on federal lands to vote nor did the United States acquire those rights. The right to vote is personal to the citizen and depends on whether he has met the qualifications of sec. 1, Art. II of our Constitution. If the State retains jurisdiction over a federal area sufficient to justify a holding that it remains a part of the State of California a resident therein is a resident of the State and entitled to vote by virtue of the Constitutionally granted right. No express reservation of such rights is necessary, nor could any attempted express cession of such rights to the United States be effective." The reasoning applied in that opinion is applicable in the instant case.
There is authority for the position that where property ceded to the United States is no longer used for the purposes for which acquired, it automatically becomes subject to the laws of the State from which acquired. See S.R.A., Inc. v. State of Minnesota, 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851; Palmer v. Barrett, 162 U.S. 399, 16 S.Ct. 837, 40 L.Ed. 1015; Fort Leavenworth Railroad Co. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264.
Other authorities which have considered the question or reflect the numerous difficulties arising from the doctrine of exclusive Federal jurisdiction over such reservations may prove helpful. Adams v. United States, 319 U.S. 312, 63 S.Ct. 1122, 87 L.Ed. 1421; Penn Dairies v. Milk Control Commission of Pennsylvania, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748; Pacific Coast Dairy v. Department of Agriculture of California, 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761; Western Union Telegraph Co. v. Chiles, 214 U.S. 274, 29 S.Ct. 613, 53 L.Ed. 994; Renner v. Bennett, 21 Ohio St. 431; Divine v. Unaka National Bank, 125 Tenn. 98, 140 S.W. 747, 39 L.R.A.,N.S., 586; In re Kernan, 247 App.Div. 664, 288 N.Y.S. 329; Harrison v. Laveen, 67 Ariz. 337, 196 P.2d 456; Barrett v. Parks, 352 Mo. 974, 180 S.W.2d 665; Herken v. Glynn, 151 Kan. 855, 101 P.2d 946; Wolcott v. Holcomb, 97 Mich. 361, 56 N.W. 837, 23 L.R.A. 215; 12 George Washington Law Review 80; 37 Yale Law Journal 796; 58 Yale Law Journal 1402; 53 Harvard Law Review 1046; 22 California Law Review 152; 24 California Law Review 573.
In a number of Acts of Congress, rights of States to exercise jurisdiction in some respects over such reservations have been recognized, thus making it clear, we believe, that the lands within such reservations in some respects remain the territory of the ceding States. Thus, in the "Buck Act" mentioned above, 4 U.S.C., § 14, the rights of the respective States to assess and collect "such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area", were recognized. A statute, 40 U.S.C., § 290, 40 U.S.C.A. § 290, authorizes the several States to apply and enforce the workmen's compensation laws "to all lands and premises owned or held by the United States of America by deed or act of cession, by purchase or otherwise * * *". Another statute, 16 U.S.C., § 457, 16 U.S.C.A. § 457, provides that in case of wrongful death "within a national park or other place subject to the exclusive jurisdiction of the United States * * * *139 such right of action shall exist as though the place were under the jurisdiction of the State * * *". Another Act, 26 U.S.C., § 1606, authorizes the respective States to enforce their unemployment compensation laws over "premises owned, held, or possessed by the United States, and any State shall have full jurisdiction and power to enforce the provisions of such law to the same extent and with the same effect as though such place were not owned, held, or possessed by the United States". As early as 1825 the Congress enacted an assimilation crime statute, providing, in effect, that any offense for which any penalty was not provided by Federal law should be subject to the penalty provided by the State. Revised Statutes, Second Edition, § 5391. Thus, the effect of such statutes is to recognize or vest in the respective States certain rights and privileges over such reservations and, especially in view of later Acts of Congress authorizing acceptance by the United States of partial jurisdiction, there certainly no longer exists any basis for the holdings to the effect that the United States must have and exercise complete and exclusive jurisdiction over such reservations. "In matters not affecting the operation of the national government, there is no sound reason why federal area residents should not have the same rights, immunities, and responsibilities as residents of the surrounding state". 58 Yale Law Journal 1402, 1406.
From the authorities considered it is clear, we think, that the State cannot be denied sovereignty over any part of its territory except by its own consent; that the consent of the State to acquisition by the United States of territory for certain defined purposes does not deny the exercise of sovereignty of the State over the territory as to purposes which can in no manner conflict or interfere with the use of the territory by the United States for the purpose or purposes for which it was acquired; that exclusive jurisdiction over such territory cannot be foisted upon the United States without its acceptance; and that the State and Federal Governments may, and in numerous cases do, exercise concurrent jurisdiction over territory ceded by the respective States to the Federal Government under consent statutes similar to that under which the South Charleston Naval Reservation was acquired.
The same conclusions are clearly reflected under the present State "consent" statute and the applicable Act of Congress quoted above. Thus, the State statute cedes territory only on the condition that it have concurrent jurisdiction over the territory ceded "to execute process * * * and such other jurisdiction and authority over the same as is not inconsistent with the jurisdiction ceded to the United States by virtue of such acquisition". As to territory acquired pursuant to the provisions of 50 U.S.C., § 175, 50 U.S.C.A. § 175, quoted above, the United States cannot claim jurisdiction greater than indicated in its acceptance. In these circumstances, joint sovereignty will exist. The State sovereignty is limited, of course, to the extent that it will not conflict or interfere with the sovereign power of the United States over such reservations for the purpose or purposes for which acquired.
To hold that the exclusive jurisdiction doctrine contended for by relators applies in the circumstances of the instant case would effectively deny the large ever growing number of individuals residing within Federal enclaves the privilege of voting, notwithstanding they are charged with burdens of government. It would also deny them the benefits of laws in fields wherein the Federal Government cannot, or has not, legislated. See Lowe v. Lowe, 150 Md. 592, 133 A. 729, 46 A.L.R. 983, Divorce; Harris v. Harris, 205 Iowa 108, 215 N.W. 661, Divorce; Tagge v. Gulzow, 132 Neb. 276, 271 N.W. 803, Public Schools; Divine v. Unaka National Bank, 125 Tenn. 98, 140 S.W. 747, Administration of Estates; In re Kernan, 247 App.Div. 664, 288 N.Y.S. 329, Custody; Foley v. Shriver, 81 Va. 568, Attachment Proceedings; Heirich v. Howe, 50 N.M. 90, 171 P.2d 312, Adoptions; In re Burrus, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500, Domestic Relations. We cannot believe that such results were ever intended *140 by the United States or by the State. No necessity therefor existed.
We must now determine the effect of the ceding by the State, and the acquisition of the territory within the South Charleston Naval Reservation, with reference to the rights of a person residing therein with the consent, in fact, at the instance, of the United States, who was for years prior to moving thereon a citizen, resident and voter of the State of West Virginia, and continued as such unless residence on the reservation changed his status to that of a nonresident. In considering that question we keep in mind that nothing in the record of this case indicates that the United States has ever accepted, by exercised authority or otherwise, any right of jurisdiction as to the voting privilege of persons residing on the reservation, or of the State in considering and treating such persons as citizens and residents of the State for the purpose of voting therein. We believe no basis exists for any contention that the existence of the right and privilege to vote would in any way conflict or interfere with the use of the property by the United States for the purpose or purposes for which it was acquired. Mere ownership of the land by the United States would enable it to prevent persons from residing thereon. Sovereignty for that purpose would not be necessary. We also keep in mind that the privilege of voting is one of the most prized privileges under our form of government, and that the proper exercise thereof is essential to the continuous and efficient operation of government, both Federal and State. That privilege is guarded jealously by both State and Federal laws, and should not be denied upon superficial technicalities, or refined theories.
As to the question posed, we have concluded that the State, in ceding the territory within the South Charleston Naval Reservation, retained sovereignty over the same to the extent that such State sovereignty does not conflict or interfere with the "power" of the Federal Government "to exercise exclusive jurisdiction" as to the uses and purposes for which the land was acquired, and that such uses and purposes have no relation to the right or privilege of persons residing thereon, with the consent of the United States, to vote in State elections. In so far as this record shows, the Federal Government has never accepted, claimed or attempted to exercise, any jurisdiction as to the right of any resident of the reservation to vote.
Considering the State consent statute under which the land within the reservation was acquired, quoted above, it will be observed that the "consent" given extended only "for the purpose" for which the land could be acquired under Clause 17 "or for any other purpose for which the same may be needed or required by the government of the United States". The reservation was most certainly not acquired by the United States, and is not needed or used, for any purpose necessitating the disfranchisement of individuals permitted to reside thereon. Being thus qualified and limited, it seems clear that the State intended to consent to the exercise of jurisdiction over the territory by the United States only as to those matters for which the territory was acquired, and to retain sovereignty over the same to the extent that State sovereignty would not conflict with the use of the territory by the United States. Further indication of the intent on the part of the State to retain some right in the territory is found in the provision that "The evidence of title to such land shall be recorded as in other cases". Would the State be interested in "evidence of title" to land situated completely and absolutely in some foreign jurisdiction?
It may be that in the early history of our country, when the areas of such reservations were few and small (see West Virginia statute quoted above limiting areas which could be ceded to twenty-five acres), there was some justifiable reason, or at least no serious injustice, in holding that the Federal Government acquired sole sovereignty over such ceded lands. But can such a result be justified where large and numerous areas are now owned and are being continually acquired by the United States? However that may be, the United States *141 has, we think, long since refused to accept sole sovereignty of such ceded lands and has repeatedly, both through its Courts and by Acts of Congress, recognized and insisted that States have retained sovereignty as to such matters as do not interfere or conflict with the use of the areas by the United States for the purpose or purposes for which the same were ceded. By so holding, the necessity of disfranchising a large number of citizens is avoided.
Having reached the conclusions indicated, the peremptory writ of mandamus prayed for was denied.
Writ denied.
HAYMOND, Judge (dissenting).
The decision of the majority in denying the writ sought in this proceeding is based upon a misconception of the effect of Section 4 of Chapter 5, Acts of the Legislature, 1917, Second Extraordinary Session, and a misapplication ofSection 3 of Chapter 1 of the Code of 1931. It is contrary to an unbroken line of decisions of the Supreme Court of the United States and appellate courts in other States, some of which, clearly refuting the conclusion reached, are cited in the majority opinion. It is also completely unsupported by any persuasive applicable text or case authority. In consequence I dissent to the extent indicated in this opinion.
Section 4 of Chapter 5, Acts of the Legislature, 1917, Second Extraordinary Session, pursuant to which the United States acquired the Naval Reservation, contains, among others, these comprehensive provisions: "In pursuance of the seventeenth clause of the eighth section of the first article of the constitution of the United States, the consent of the legislature of West Virginia is hereby given to the purchase or condemnation or acceptance as a gift, whether heretofore or hereafter made or had to the government of the United States, or under its authority, of any tract or parcel of land within the limits of the state, for the purpose of erecting thereon light houses, beacons, signal stations, post offices, custom houses, court houses, locks, dams, works for the improvement of the navigation of any watercourse, armor plate manufacturing plants, projectile factories or factories of any kind or character, or any other needful buildings or structures or proving grounds, or work of public improvement whatever, or for any other purpose for which the same may be needed or required by the government of the United States. The evidence of title to such land shall be recorded as in other cases." The only reservation by this State of jurisdiction or authority in effect when the Act of 1917 was passed appeared in Section 5 of Chapter 20, Acts of the Legislature, 1881, Regular Session, and consisted of the right to execute civil and criminal process within the limits of any land acquired by the United States. Section 4 of Chapter 5, Acts of the Legislature, 1917, Second Extraordinary Session, and Section 5 of Chapter 20, Acts of the Legislature, 1881, Regular Session, not the subsequent enactment of Sections 3 and 4 of Chapter 1 of the Code of 1931, govern and control the nature and the extent of the jurisdiction of the United States over the Naval Reservation on which the defendant Londeree resided when he announced his candidacy for the Democratic nomination for the office of mayor of the City of South Charleston. This is necessarily so despite the apparent and clearly erroneous view of the majority that, because the Legislature, by the subsequent enactment of Section 3 of Chapter 1, Code, 1931, reserved concurrent jurisdiction over land acquired by the United States, this State retained or in some mysterious and unexplained manner regained its original political jurisdiction over the Naval Reservation which was purchased by the United States pursuant to the consent given by the Act of 1917,
As previously indicated, the nature and the extent of the jurisdiction acquired by the United States over land within a State purchased by the United States pursuant to consent to such acquisition given by a statute of the State which reserved only the right to execute civil and criminal process upon the land acquired by the United States, *142 have been frequently considered by recognized text writers and appellate courts in many other jurisdictions.
More than a century ago the illustrious Joseph Storey, then an Associate Justice of the Supreme Court of the United States, in his Commentaries on the Constitution, published in 1833, Volume II, Section 1227, 5th Edition, in discussing the civil and political rights of persons who reside upon military reservations acquired by the United States, under Clause 17, Section 8, Article I, of the Constitution of the United States, with the consent of the State in which such reservations are situated, used this language: "It follows from this review of the clause, that the States cannot take cognizance of any acts done in the ceded places after the cession; and, on the other hand, the inhabitants of those places cease to be inhabitants of the State, and can no longer exercise any civil or political rights under the laws of the State." The same eminent jurist, at circuit, in United States v. Cornell, 2 Mason 60, Fed.Cas.No.14,867, decided in 1819, held that a State which consented to the purchase by the United States of land within it for a fort had no jurisdiction of an offense there subsequently committed, and in the opinion said: "The Constitution of the United States declares that Congress shall have power to exercise `exclusive legislation' in all `cases whatsoever' over all places purchased by the consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings. When therefore a purchase of land for any of these purposes is made by the national government, and the State Legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of Congress, and the State jurisdiction is completely ousted. This is the necessary result, for exclusive jurisdiction is the attendant upon exclusive legislation; and the consent of the State legislature is by the very terms of the constitution, by which all the states are bound, and to which all are parties, a virtual surrender and cession of its sovereignty over the place. Nor is there anything novel in this construction. * * *."
Chancellor Kent, in his Commentaries, first published in 1826, Volume 1, Lecture 19, §§ 429, 430, 431, Fourteenth Edition, pages 574 to 578, with respect to the operation of Clause 17, Section 8, Article I, of the Constitution of the United States, entertained the same view as that held by Justice Storey and expressed it in these words:
"The state governments may likewise lose all jurisdiction over places purchased by Congress, by the consent of the legislature of the state, for the erection of forts, dock-yards, light-houses, hospitals, military academies, and other needful buildings. The question which has arisen on the subject was as to the effect of the proviso or reservation, usually annexed to the consent of the state, that all civil and criminal process, issued under the authority of the state, might be executed on the lands so ceded, in like manner as if the cession had not been made. This point was much discussed in the Circuit Court of the United States in Rhode Island, in the case of United States v. Cornell. It was held that a purchase of lands within the jurisdiction of a state, with the consent of the state, for the national purposes contemplated by the Constitution, did, ipso facto, by the very terms of the Constitution, fall within the exclusive legislation of Congress, and that the state jurisdiction was completely ousted. * * *. The courts of the United States have sole and exclusive jurisdiction over an offense committed within a ceded place, notwithstanding the ordinary reservation of the right to execute civil and criminal process of the state. That was no reservation of any sovereignty or jurisdiction. * * *.
"It follows, as a consequence, from this doctrine of the federal courts, that state courts cannot take cognizance of any offences committed within such ceded districts; and, on the other hand, that the inhabitants of such places cannot exercise any civil or political privileges under the laws of the state, because they are not *143 bound by those laws. This has been so decided in the state courts. * * *."
In 18 Am.Jur., Elections, § 66, the text contains these statements: "Residence in a military reservation of the Federal Government will not give one a right to vote at a state election held in the county where the reservation is located. Similarly, where the land upon which an asylum or other institution is erected has been ceded to the United States, the inmates thereof are denied the right of suffrage upon the ground that they lose their status as citizens of the state and can no longer exercise any civil or political rights under its laws." See also 9 R.C.L., Elections, § 49.
In 29 C.J.S., Elections, § 25, the statement is: "Since land which has been ceded by a state to the United States for the use of some department of the general government, without any reservation of jurisdiction except the right to serve civil and criminal process thereon, ceases to be a part of the state, * * *, such land ordinarily cannot become a voting residence in the state in which it is situated, until it is receded to the state by congress."
In McCrary on Elections, 4th Edition, § 89, the author uses this language: "Where a State has ceded a given tract of land to the United States for a navy yard, arsenal or the like, and where there is no reservation of jurisdiction to the State other than the right to serve civil and criminal process on such lands, persons who reside upon such lands do not acquire any elective franchise as inhabitants of such State."
In Paine on Elections, § 62, the text contains this statement: "Persons who reside upon land ceded by a state to the United States, as the site of an arsenal or navy yard, without reservation of jurisdiction beyond the right to serve civil and criminal process thereon, are not entitled to vote as inhabitants of the state."
In the early but well considered and frequently cited case of Commonwealth v. Clary, 8 Mass. 72, decided in 1811, involving the question of jurisdiction of an offense committed on land in the town of Springfield, in the State of Massachusetts, purchased by the United States with the consent of the State for use in erecting arsenals, with the reservation that civil and criminal process could be served upon the land by officers of the State, the Supreme Judicial Court of Massachusetts held that the State could not take cognizance of such offense. In the opinion the court said: "* * * the territory, on which the offence charged is agreed to have been committed, is the territory of the United States, over which the congress have the exclusive power of legislation. The assent of the commonwealth to the purchase of this territory by the United States, had this condition annexed to it:that civil and criminal process might be served therein by the officers of the commonwealth. This condition was made with a view to prevent the territory from becoming a sanctuary for debtors and criminals; and from the subsequent assent of the United States to the said condition, evidenced by their making the purchase, it results that the officers of the commonwealth, in executing such process, act under the authority of the United States. No offences committed within that territory, are committed against the laws of this commonwealth; nor can such offences be punishable by the courts of the commonwealth, unless the congress of the United States should give to the said courts jurisdiction thereof."
In the leading case of Fort Leavenworth Railroad Company v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264, decided in 1885, cited but not followed in the majority opinion, the Supreme Court of the United States declared that when the United States acquired land within a State by purchase, with the consent of the Legislature of the State, for the erection of forts, magazines, arsenals, dockyards and other needful buildings, the Constitution of the United States confers exclusive jurisdiction upon the United States over the land so acquired. The land there involved was not acquired by purchase and the act of the Kansas Legislature ceding jurisdiction to the United States reserved to the State the *144 right "to tax railroad, bridge, and other corporations, their franchises and property," on the Fort Leavenworth Military Reservation. The court held that the terms of the act ceding jurisdiction governed the extent of the jurisdiction acquired by the United States and upheld the tax imposed by the State of Kansas; but in the opinion prepared by Justice Field the court used this language:
"When the title is acquired by purchase by consent of the Legislatures of the States, the federal jurisdiction is exclusive of all State authority. This follows from the declaration of the Constitution that Congress shall have `like authority' over such places as it has over the district which is the seat of government; that is, the power of `exclusive legislation in all cases whatsoever.' Broader or clearer language could not be used to exclude all other authority than that of Congress; and that no other authority can be exercised over them has been the uniform opinion of Federal and State tribunals, and of the Attorneys General.
"The reservation which has usually accompanied the consent of the States that civil and criminal process of the State courts may be served in the places purchased, is not considered as interfering in any respect with the supremacy of the United States over them; but is admitted to prevent them from becoming an asylum for fugitives from justice." After citing earlier authorities the Court also said: "These authorities are sufficient to support the proposition which follows naturally from the language of the Constitution, that no other legislative power than that of Congress can be exercised over lands within a State purchased by the United States with her consent for one of the purposes designated; and that such consent under the Constitution operates to exclude all other legislative authority."
The Fort Leavenworth Railroad Company case has never been overruled or departed from by the Supreme Court of the United States despite its characterization in the majority opinion as one of the "older" cases but has been cited and followed by numerous state courts and by the Supreme Court of the United States in many of its subsequent decisions, particularly the cases of Surplus Trading Company v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091, decided in 1930, and United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761, also decided in 1930, both of which are cited, but neither of which is followed, in the majority opinion. In Surplus Trading Company v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091, the Supreme Court of the United States held that the jurisdiction of the United States over lands within a State purchased by the United States with the consent of the State, for the erection of forts, magazines, arsenals, dockyards and other needful buildings, is exclusive; and in discussing that point in the opinion made this statement: "The question is not an open one. It long has been settled that, where lands for such a purpose are purchased by the United States with the consent of the state Legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction." In United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761, the same court held that the jurisdiction of the United States over lands purchased for such use "is exclusive of all State authority." See also Arlington Hotel Company v. Fant, 278 U.S. 439, 49 S.Ct. 227, 73 L.Ed. 447, decided in 1929, the opinion in which was prepared by Chief Justice Taft. In that case, which is also cited but not followed in the majority opinion, the principle that the jurisdiction of the United States over land within a State, acquired by the consent of the State, is exclusive of all state authority was recognized and applied.
Other decisions of the Supreme Court of the United States, subsequent to the case of Fort Leavenworth Railroad Company v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264, which recognize and approve the principle of that case that when the United States acquires land within a State *145 by purchase, with the consent of the Legislature of the State, accompanied with a reservation by the State of the right to execute civil and criminal process upon the land so acquired, the jurisdiction of the United States is exclusive of all State authority, are Standard Oil Company v. People of State of California, 291 U.S. 242, 54 S.Ct. 381, 78 L.Ed. 775, decided in 1934, and Johnson v. Yellow Cab Transit Company, 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814, decided in 1944. In the Standard Oil Company case the court held that the sale of gasoline on the Presidio Military Reservation, was not subject to tax by the State and said: "A state cannot legislate effectively concerning matters beyond her jurisdiction and within territory subject only to control by the United States."; and in the Johnson case the court held that the seizure at Oklahoma City, Oklahoma, by state officers, of a shipment of 225 cases of wines and liquors from East Saint Louis, in the State of Illinois, to an officers' club at Fort Sill, in the State of Oklahoma, was illegal and ordered its return on the ground that the jurisdiction of the United States over the Fort Sill Military Reservation in that State, which had been ceded to the United States by the Legislature of the State with reservation of the right of the State to serve civil and criminal process, was exclusive. In James v. Dravo Contracting Company, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318, cited and discussed in the majority opinion, the Supreme Court of the United States cites the Fort Leavenworth Railroad Company case and does not depart from its holding.
Among the numerous decisions of appellate courts in many States which recognize or apply the same principle of exclusive jurisdiction of the United States over territory acquired by the consent of the State in which it is located are these cases: Arledge v. Mabry, 52 N.M. 303, 197 P.2d 884, decided in 1948; Kiker v. City of Philadelphia, 346 Pa. 624, 31 A. 2d 289, decided in 1943, cited but not followed in the majority opinion; People v. Hillman, 246 N.Y. 467, 159 N.E. 400, decided in 1927; Farley v. Scherno, 208 N.Y. 269, 101 N.E. 891, 47 L.R.A.,N.S., 1031, decided in 1913; Commonwealth v. King, 252 Ky. 699, 68 S.W.2d 45, decided in 1934; Webb v. J. G. White Engineering Corporation, 204 Ala. 429, 85 So. 729, decided in 1920; Concessions Company v. Morris, 109 Wash. 46, 186 P. 655, decided in 1919; State ex rel. Jones v. Mack, 23 Nev. 359, 47 P. 763, 62 Am.St.Rep. 811, decided in 1897; Willis v. Oscar Daniels Company, 200 Mich. 19, 166 N.W. 496, decided in 1918; Anderson v. Chicago and Northwestern Railroad Company, 102 Neb. 578, 168 N.W. 196, decided in 1918; Bank of Phoebus v. Byrum, 110 Va. 708, 67 S.E. 349, 27 L.R.A.,N.S., 436, 135 Am.St.Rep. 953, decided in 1910; Foley v. Shriver, 81 Va. 568, decided in 1886; State v. Morris, 76 N.J.L. 222, 68 A. 1103, decided in 1908 and Mitchell v. Tibbetts, 17 Pick., Mass., 298, decided in 1836.
In Kiker v. City of Philadelphia, 346 Pa. 624, 31 A.2d 289, involving the question of the right of the city to impose a tax upon income received by a nonresident of Pennsylvania from his employment by the United States at the Philadelphia Navy Yard, and in which it was held that the city could impose such tax by virtue of an Act of Congress which receded that authority to the state, the opinion contains these statements:
"It is clear that since this Commonwealth granted to the United States government exclusive jurisdiction, without qualification or restriction, save as to the service of civil and criminal process and as to limitation upon the duration of the cession, the City of Philadelphia could not lawfully impose a tax upon income received by a nonresident from transactions occurring or services performed in the Federal Area of League Island (Standard Oil Company v. [People of State of] California, 291 U.S. 242 [54 S.Ct. 381]), unless, of course, Congress can grant such consent. See United States v. City of Buffalo, [2 Cir.] 54 F.2d 471. It was originally supposed that a State, in granting consent to the Federal government to purchase territory upon which to erect forts, magazines, *146 arsenals, dock-yards and other needful buildings, could not constitutionally qualify its consent, and that jurisdiction, under such circumstances, had to be exclusively in the United States government, on account of the provisions of Article I, Section 8, clause 17 of the Constitution of the United States: United States v. Cornell, [Fed.Cas.No.14,867] 2 Mason's Reports (U.S.C.C.) 60; Fort Leavenworth R. R. Co. v. Lowe, 114 U.S. 525 [5 S.Ct. 995]. However, it is now well settled that in granting consent to the Federal government a State can reserve to itself such jurisdiction (e. g. the right to impose taxes in the area in question) as will not interfere with the enjoyment by the government of the United States of the property for the uses and purposes for which it was obtained: James v. Dravo Contracting Company, 302 U.S. 134, [58 S.Ct. 208] * * *.
"It follows, therefore, that the Commonwealth of Pennsylvania, when it consented to the purchase of League Island by the National government and ceded jurisdiction over it, could have reserved to itself the right to tax in such area, even though the territory was acquired for use as a dock-yard, just as a number of States have done under similar circumstances with respect to land within their respective geographical limits. There can be no logical objection on constitutional grounds if the same result is accomplished by a recession to the State of the right to tax, should Congress see fit by this means to promote local efficiency, as it appears to us to have done in passing Public Act No. 819. Similar retrocessions to the States of the Union are not unusual. While any cession, or recession, of jurisdiction by one sovereignty to another requires an acceptance in order to render it effective (Yellowstone Park Transp. Co. v. Gallatin County, [9 Cir.] 31 F.2d 644); such acceptance will be presumed in the absence of a contrary intent ([Silas] Mason Co. v. Tax Comm'n, supra). No such contrary intent appears anywhere in the record in the instant case. `The States of the Union and the National Government may make mutually satisfactory arrangements as to jurisdiction of territory within their borders and thus in a most effective way, cooperatively adjust problems flowing from our dual system of government': Collins v. Yosemite Park Co., 304 U.S. 518, 528 [58 S.Ct. 1009, 82 L.Ed. 1502]".
In the Kiker case the court recognized the principle of exclusive jurisdiction in the United States resulting from the purchase of the territory by the United States with the consent of the State with no reservation of the power to tax in that area but held that, by virtue of the Act of Congress of October 9, 1940, Public Act No. 819, 54 Stat. 1059, 4 U.S.C.A., § 14, commonly known as the Buck Act, which provided by Section 2 that persons living or receiving income in a Federal area should not be relieved from liability to pay any income tax levied by any State or any duly constituted State taxing authority having jurisdiction to levy such a tax, by reason of residence or employment in the Federal area, the State had regained from the United States its power to impose the tax the collection of which the plaintiff sought to enjoin.
In the opinion in Foley v. Shriver, 81 Va. 568, the Supreme Court of Virginia, after citing Fort Leavenworth Railroad Company v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264; United States v. Cornell, 2 Mason 60, Fed.Cas.No.14,867; Commonwealth v. Clary, 8 Mass. 72; Mitchell v. Tibbetts, 17 Pick., Mass., 298, the Opinion of the Justices of the Supreme Judicial Court of Massachusetts, 1 Metc. 580, and Sinks v. Reese, 19 Ohio St. 306, 2 Am.Rep. 397, uses this language: "From the foregoing cases it is clear that no other legislative power than that of congress can be exercised over lands within a State purchased by the United States with the consent of the State for one of the purposes designated and that such consent, under the constitution, operates to exclude all other legislative authority. If the United States has the right of exclusive legislation over the ceded lands, they also have the exclusive jurisdiction. The right of exclusive legislation gives exclusive jurisdiction. United States v. Cornell, supra, People v. *147 Godfrey, 17 Johns. 225; 16 Opinions Attorney-General 592. In this case, the State legislature having given the required consent, and the United States having purchased the land in question, the United States have acquired, under the Federal Constitution, exclusive jurisdiction over the ceded lands, and they are no longer a part of the State of Virginia and are not subject to the jurisdiction of the State courts. Persons residing there are not citizens of Virginia; the property situated there is not subject to the control or disposal of any State court, and the circuit court of Elizabeth City county is without jurisdiction within the said territory. The reservation in the act of cession of concurrent jurisdiction with the United States over the same piece or parcel of land, so that the courts, magistrates and officers of the State may take such cognizance, execute such process, and discharge such other legal functions within the same as may not be incompatible with the consent hereby given, is subject to the provisions of the first article and eighth section of the Federal Constitutionthat is, as may not be incompatible with the exclusive jurisdiction of the United States, and which may operate to authorize the service by the officers of the State of the civil and criminal process of the State courts, with reference to acts done within the acknowledged territory of the State outside of the ceded lands."
The specific question here under consideration with respect to the right of elective franchise of persons who reside upon land within a State purchased by the United States, with the consent of the Legislature of the State, for the erection of forts, magazines, arsenals, dockyards and other needful buildings, accompanied by the reservation by the State of the right to execute civil and criminal process in the area so purchased has been considered by "an unruffled current of authority" in several States and in each instance the claimed right to exercise such franchise by persons permanently residing in the territory so purchased by the United States has been denied. Miller v. Hickory Groves School Board, District No. 4, 162 Kan. 528, 178 P.2d 214, decided in 1947; State ex rel. Parker v. Corcoran, 155 Kan. 714, 128 P.2d 999, 142 A.L.R. 423, decided in 1942; Herken v. Glynn, 151 Kan. 855, 101 P.2d 946, decided in 1940; State ex rel. Lyle v. Willett, 117 Tenn. 334, 97 S.W. 299, decided in 1906; McMahon v. Polk, 10 S.D. 296, 73 N.W. 77, 47 L.R.A. 830, decided in 1897; In re Town of Highlands, 48 N.Y.St.R. 795, 22 N.Y.S. 137, decided in 1892; and Sinks v. Reese, 19 Ohio St. 306, 2 Am.Rep. 397, decided in 1869. See also Arledge v. Mabry, 52 N.M. 303, 197 P.2d 884, in which the Court, referring to the question of the exercise of the elective franchise by persons residing upon territory acquired by the United States in the manner provided by the Constitution of the United States, used this language: "However, there are several precedents in the books where that issue was involved. Without exception, under circumstances similar to those here present, courts have denied the claimed right upon the ground of want of residence within the state by the person asserting it."
In McMahon v. Polk, 10 S.D. 296, 73 N.W. 77, 47 L.R.A. 830, also cited but not followed in the majority opinion, the Supreme Court of South Dakota held that a person, not in the army or the navy, cannot, by long and continuous residence within the boundaries of a reservation jurisdiction over which is ceded to the United States, acquire the right to vote at a state election in the county in which the reservation is situated; and in the opinion said: "The vote of R. W. Wells, cast at Sturgis precinct for appellant, was rejected by the court as illegal and void upon the ground that said Wells was a nonresident of the precinct, having his place of abode within the military reservation of Ft. Meade; and to this point our attention is directed by the first assignment of error. By the fifth subdivision of Section 18, Art. 26, of the Constitution, jurisdiction over the military reservation of Ft. Meade is surrendered to the United States without reservation other than the right to serve legal process in certain cases; and the question presented by the record is whether a person *148 in no way connected with the army or navy may, by long and continuous residence within the boundaries of the reservation thus ceded, acquire the right to vote at an election held in the county where the same is situated, pursuant to the law of the state. In his Commentaries on the Constitution (Sec. 1227), Judge Story, in treating the eighth section of the first article of the Constitution authorizing congress to exercise exclusive legislative power over military reservations obtained by the consent of the state in which the same are situated, says: `The inhabitants of those places cease to be inhabitants of the state, and can no longer exercise any civil or political rights under the laws of the state.' The doctrine resting upon and sustained by an unruffled current of authority seems to be that all political powers and jurisdiction over a military reservation, not expressly retained by the state, are surrendered absolutely to the general Government by a voluntary transfer of lands for the exclusive use of the army or navy; and consequently a person residing thereon acquires none of the constitutional qualifications of an elector."
In the frequently cited case of Sinks v. Reese, 19 Ohio St. 306, 2 Am.Rep. 397, involving the question whether inmates of a National Asylum for Disabled Volunteer Soldiers, established by act of Congress upon land within the State of Ohio acquired by the United States with the consent of the Legislature of the State, were entitled to vote at an election held in the county in which the asylum was situated, the Supreme Court of Ohio held that the asylum was a needful building within the constitutional provision permitting the United States to acquire land, that the United States had exclusive jurisdiction over the land, and that the inmates of the asylum were not residents of the State and for that reason were not entitled to vote at the election. In the opinion, with respect to the act of the Legislature consenting to the establishment of the asylum, the court said: "This act of the State Legislature, consenting to the establishment of the asylum within her borders, and ceding `jurisdiction of the lands and appurtenances' of the asylum to the United States, under the operation of the clauses of the eighth section of the first article of the Constitution of the United States above referred to, fixes the exclusive jurisdiction of the general government over this institution, its lands and its inmates, `in all cases whatsoever,' except as to the execution of process issuing under State authority." The opinion also contains these expressions: "This leads us to consider what is the legal status of persons who become residents upon the grounds, and within the limits of the institution thus within the exclusive jurisdiction of the United States; and how does it affect their claim to exercise the elective franchise in Ohio, under its constitution and laws? In passing on these questions, there is little need of speculative reasoning; for they have been in effect settled by repeated decisions of courts of high and conclusive authority. By becoming a resident inmate of the asylum, a person though up to that time he may have been a citizen and resident of Ohio, ceases to be such; he is relieved from any obligation to contribute to her revenues, and is subject to none of the burdens which she imposes upon her citizens. He becomes subject to the exclusive jurisdiction of another power, as foreign to Ohio as is the State of Indiana or Kentucky, or the District of Columbia. The constitution of Ohio requires that electors shall be residents of the State; but under the provisions of the Constitution of the United States, and by the consent and act of cession of the legislature of this State, the grounds and buildings of this asylum have been detached and set off from the State of Ohio, and ceded to another government, and placed under its exclusive jurisdiction for an indefinite period. We are unanimously of the opinion that such is the law, and with it we have no quarrel; for there is something in itself unreasonable that men should be permitted to participate in the government of a community, and in the imposition of charges upon it, in whose interests they have no stake, and from whose burdens and obligations they are exempt."
*149 To the same effect as the Sinks case is the holding of the Supreme Court of Tennessee in State ex rel. Lyle v. Willett, 117 Tenn. 334, 97 S.W. 299, in which that court said: "If, as we have held, and as controlling authorities elsewhere hold, the United States has exclusive jurisdiction over the land on which the Soldiers' Home in question was erected, then the residents in that home are nonresidents of the State of Tennessee, and cannot fall within the requirements for legal voters laid down by our constitution."
In re Town of Highlands, 48 N.Y.St.R. 795, 22 N.Y.S. 137, the Supreme Court of New York held that, as the State of New York had ceded to the United States the territory comprising the West Point reservation and reserved no jurisdiction except the right to execute process in the ceded territory, that territory was not subject to the jurisdiction of the State and was not a part of the State and that persons having no other qualifications as residents than a residence in the ceded territory were not residents of the State and were not entitled to vote.
In Herken v. Glynn, 151 Kan. 855, 101 P.2d 946, the opinion states that: "No case has been found where it has been held that residents on lands ceded by a state to the United States retained or acquired a right to vote as residents of the ceding state." The quoted passage is presently pertinent for it is significant that the majority opinion neither cites nor refers to an opinion in any case by any appellate court of last resort in any jurisdiction which holds that a permanent resident upon land purchased by the United States, with the consent of the State in which it is situated, accompanied merely with a reservation by the State of the right to serve civil and criminal process in the purchased territory, has the right to vote at any election held under the laws of such State. Though the case of Arapajolu v. McMenamin, 113 Cal.App.2d 824, 249 P. 2d 318, 34 A.L.R.2d 1185, decided by a California District Court of Appeal in 1952, cited in the majority opinion, holds that residents of a United States military reservation were entitled to vote at elections conducted under the laws of the State of California, the opinion does not disclose the manner in which the area was acquired by the United States or what reservations accompanied the acquisition of the territory by the United States, and the holding of the district appellate court cannot be said to be final or persuasive authority applicable to residents of the Naval Reservation here involved which was purchased by the United States with the consent of this State without reservation of any jurisdiction or authority except the right to execute civil and criminal process in the purchased area.
From the foregoing authorities it is clear that when the United States purchased the Naval Reservation by virtue of the consent given for that purpose by the Legislature of this State by Section 4 of Chapter 5, Acts of 1917, Second Extraordinary Session, and the Legislature had reserved by Section 5 of the Act of 1881 only the right to execute civil and criminal process within the limits of the land so acquired, and the United States recognized that consent by making such purchase and accepting deeds for the land, the United States became vested with exclusive jurisdiction over the Naval Reservation to the exclusion "of all State Authority", United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761; that though such grant or cession of jurisdiction by this State to the United States must be accepted by the United States to render it effective, acceptance is presumed in the absence of evidence of a contrary intent, Kiker v. City of Philadelphia, 346 Pa. 624, 31 A.2d 289; Silas Mason Company v. Tax Commission of State of Washington, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187; that in order to regain any portion of the jurisdiction so transferred by this State to the United States there must be a recession by the United States of such jurisdiction to the State, Kiker v. City of Philadelphia, 346 Pa. 624, 31 A.2d 289; and that this State, in consenting to the acquisition of land within its borders by the United States, could have reserved concurrent jurisdiction or jurisdiction with respect to particular matters in the territory so acquired *150 which would not interfere with the use for which the land was acquired by the United States, James v. Dravo Contracting Company, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318.
Proper application of the foregoing firmly established principles of law impels the conclusion that this State by the enactment of Section 4, Chapter 5, Acts of the Legislature, 1917, Second Extraordinary Session, consenting to the purchase of the area used by the United States for the Naval Reservation, with only a prior reservation of the right to serve civil and criminal process upon the land so purchased, resulted in the acquisition by the United States of exclusive jurisdiction over the purchased territory under Clause 17, Section 8, Article I of the Federal Constitution; that this State could have effectively reserved, by the Act of 1917, as it did by the later statute, Section 3, Chapter 1, Code, 1931, concurrent jurisdiction over any territory purchased with its consent by the United States but did not reserve such concurrent jurisdiction over any territory acquired by the United States with the consent conferred by the Act of 1917; that as to the Naval Reservation acquired by the United States with the consent conferred by the Act of 1917, this State could not, by its unilateral subsequent action in enacting Sections 3 and 4, Chapter 1, Code, 1931, regain its civil and political jurisdiction over the Naval Reservation which had passed to the United States in the absence of any recession of such jurisdiction by the United States; that no jurisdiction of the United States over the Naval Reservation has been receded by the United States to this State except the right to impose taxes to the extent permitted by the Act of Congress of October 9, 1940, Public Act No. 819, 54 Stat. 1059, 4 U.S.C.A., § 14, commonly known as the Buck Act, and such other particular rights, which do not involve or affect the right of suffrage, as may have been receded to this State by other Acts of Congress; that in all other respects the exclusive jurisdiction of the United States over the Naval Reservation continues in force and effect; and that the defendant Londeree, as well as "the large ever growing number of individuals" mentioned in the majority opinion, by voluntarily becoming a permanent resident of the Naval Reservation necessarily acquired the status of a nonresident of this State and, as such, relinquished his right to vote at any election conducted under the laws of this State. Not being entitled to vote at any such election when he filed his certificate as a candidate for the Democratic nomination for mayor of the City of South Charleston and not having acquired the status of a resident of this State entitling him to vote at the municipal election to be held on June 6, 1954, under Article IV, Section 4, of the Constitution of this State and Section 9 of the city charter, he is not eligible to be elected to, or to hold, the office of mayor of that municipality.
The confusion in the reasoning and the fallacy in the conclusion reached in the majority opinion result from the labored effort of the majority to distort the clear meaning and effect of Section 4 of Chapter 5, Acts of the Legislature, 1917, Second Extraordinary Session, which is the only applicable statute here involved, and to substitute for it the later inapplicable provision of Section 3 of Chapter 1, Code, 1931, notwithstanding the provision in Section 3 of that statute that "Jurisdiction heretofore ceded to the United States over any land within this State by any previous acts of the legislature shall continue according to the terms of the respective cessions."
James v. Dravo Contracting Company, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318, decided December 6, 1937, and Carnegie-Illinois Steel Corporation v. Alderson, 127 W.Va. 807, 34 S.E.2d 737, decided in 1945, certiorari denied 326 U.S. 764, 66 S.Ct. 146, 90 L.Ed. 460, cited and discussed in the majority opinion, have no present application except to the extent that the opinion in the James case states that "Clause 17 governs those cases where the United States acquires lands with the consent of the Legislature of the State for the purpose there described."; and to that extent that case supports my contention *151 that the consent given by the Act of 1917 to the purchase of the land comprising the Naval Reservation conferred exclusive jurisdiction over it upon the United States when the land was acquired by such purchase. In Silas Mason Company v. Tax Commission of State of Washington, 302 U. S. 186, 58 S.Ct. 233, 82 L.Ed. 187, decided December 6, 1937, also cited and discussed in the majority opinion, the facts and the provisions of the Acts of Congress and of the Statute of the State of Washington involved in that case, the specific and limited purposes for which the territory in question was acquired by the United States, which related chiefly to the improvement of the rivers and the harbors of that State and the development of irrigation and industrial power, and the clearly disclosed intent of the United States and of the State of Washington, as determined by the Supreme Court of that State, that the jurisdiction of the United States over the territory acquired should not be exclusive, distinguish that case from, and render its holding inapplicable to, the case at bar. The opinion in that case, however, with reference to the cession of jurisdiction by a State to the United States and its acceptance by the United States, contains the statement, quoted in the majority opinion, that such "Acceptance may be presumed in the absence of evidence of a contrary intent, * * *."
As the majority opinion concedes, the land involved in the James case was obtained by the United States under the later statute of 1931 by which this State reserved concurrent jurisdiction over the land acquired by the United States, and the Court in upholding a tax imposed by a statute of this State, upon the gross income derived from business and other activities conducted within its borders, based its holding upon the reservation by the State of concurrent jurisdiction over the land in question and sustained the validity of the reservation of such jurisdiction and its effectiveness for the purpose of permitting the imposition of the tax upon the income derived from business and other activities within the territorial limits of this State. In the James case, however, the prior Act of 1917, the only applicable statute involved in this proceeding, was not considered, interpreted, applied or even mentioned by the Court.
In the Carnegie-Illinois Steel Corporation case, which involved the validity of a state occupational tax upon certain business activities conducted upon this same South Charleston Naval Reservation, the tax was upheld by virtue of the recession by the United States under the Buck Act, Public Act No. 819, 54 Stat. 1059, 4 U.S.C.A., § 14, to this State, of the jurisdiction to impose the tax. On that point this Court held, in point 1 of the syllabus, that: "The Act of Congress officially referred to as Public Act No. 819 deprives persons engaged in business the operations of which are located upon a reservation owned by the United States Government of immunity from the provisions of a statute of the State of West Virginia imposing an occupational tax, the claim of immunity resting upon the lack of territorial jurisdiction on the part of the State."
The passage of the Acts of Congress mentioned in the majority opinion authorizing state action relating to the respective subjects dealt with in those statutes is indicative of the long standing general recognition of the principle that when the United States acquires, by purchase or cession, territory within the borders of a State for any of the purposes designated in Clause 17, Section 8, Article I of the Federal Constitution, with the consent of the State without reservation of jurisdiction by the State except the right to execute civil and criminal process by the State in the territory so acquired by the United States, the jurisdiction of the United States over such territory is exclusive. If this were not so there would have been no reason or necessity for the enactment of any of the Federal statutes referred to in the majority opinion. The enactment of such legislation is necessarily based on the assumption that the particular jurisdiction ceded in each instance was vested in and possessed by the United States at and until the time of its recession to the *152 ceding State by the various Acts of Congress.
The statement in the majority opinion to the effect that as the defendant Londeree would be subject to a state tax permitted by the Buck Act, if he is not entitled to vote, he would be subjected to taxation without representation, is entirely inapplicable to his status as a resident of the Naval Reservation who, having voluntarily assumed that status, is not entitled to vote at an election held under the laws of this State. The principle or the maxim of taxation without representation does not apply to the defendant Londeree as a permanent resident of the Naval Reservation just as it does not apply to permanent residents of the District of Columbia who, as a matter of common knowledge, are subject to many types of taxation, but who, as such residents, do not have the right to exercise the elective franchise in the District or in any State of the Union of which they may have been former residents but which status they have voluntarily relinquished by becoming permanent residents of the District. There are also many aliens residing in this State who do not have the right to vote at elections conducted under its laws but who are subject to various taxes, among which are property, license and excise taxes. I know of no instance in which it has been seriously asserted, as to a permanent resident of the District of Columbia or an alien who resides in this State, that any such person is subject to taxation without representation, or that any tribunal has so held in any proceeding.
The statement of the majority with respect to the loss by the defendant Londeree and "a large number of citizens" of the right to vote at elections held in this State by reason of their permanent residence upon the Naval Reservation is not of important or controlling force in the proper determination of the jurisdictional questions presented in this proceeding. If the status of the defendant Londeree, at the time he filed his certificate as a candidate for nomination for the office of mayor was that of a permanent resident of the Naval Reservation, that status was not enforced or placed upon him by compulsion of the United States in purchasing the land on which the Naval Reservation is located or of this State in consenting to such purchase by the Act of 1917 without reservation of jurisdiction with respect to elections under its laws. That status did not arise by virtue of the acquisition of exclusive jurisdiction by the United States over the Naval Reservation but in fact resulted from the free act of the defendant Londeree in becoming a resident of the reservation by voluntarily making it his permanent place of abode. Neither he nor any other person was required by any constitutional or statutory provision to reside upon the reservation. His permanent residence in that area was his own voluntary act; and it is not the province of this Court to disregard or nullify the well established legal effect of the free choice of the defendant Londeree in selecting the Naval Reservation as his permanent place of residence.
I agree that mandamus is a proper proceeding to determine the questions presented, and I concur in the principles stated in points 1 and 2 of the syllabus; but, for the reasons stated and under the numerous authorities cited, quoted from and discussed in this opinion, I dissent from the statements contained in points 3, 4 and 5 of the syllabus and the decision of the majority in denying the relief sought. I would, therefore, have awarded the writ as prayed for in this proceeding.